Thomas MORRISON and Madeleine Morrison, Plaintiffs,

v.

Eugene S. LEFEVRE, Richard W. Hongisto, William Gard, J. Kevin McNiff, David R. Harris, Joseph P. Keenan, D.A. McGuire, J.E. Sullivan, Frederick Royce, Robert Gilroy, "John" Alston, Edward Daverso, Louis Panarello, Wilfred Flecha, Edward Boulanger, John Bissonette, C. Grey, J. Jones, B. Miller, "John" Rafaniello, "John" Valdes, and "John" Arizmedi, Defendants.

No. 79 Civ. 1508 (ADS).

United States District Court, S.D. New York.

Aug. 20, 1984.

Lewitas & Yohonn, New York City, for plaintiffs; Dennis H. Lewitas, New York City, of counsel.

Robert Abrams, Atty. Gen. of New York, New York City, for defendants; Donald Sticklor, Barbara B. Butler, Ellen Bronzo, Asst. Attys. Gen., New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

Prisoners often file civil rights suits making implausible accusations that they were "framed" by prison guards or officials. This is one of those rare cases, however, in which a prisoner has succeeded in proving he was subjected to just such a violation of his constitutional rights. This case also provides a significant, albeit isolated, example of a prison leader whose protected activities account for the treatment he received in prison from malicious and indifferent officials.

Plaintiffs Thomas and Madeleine Morrison brought this suit for monetary relief under 42 U.S.C. § 1983. Thomas Morrison alleges that on September 14, 1978, while he was a prisoner at the Green Haven Correctional Facility ("Green Haven"), some of the defendants "planted" contraband—a vial of the fluorescent marking ink used to stamp the hands of visitors—inside a battery recharger that his wife had brought to the prison for him. Following the "discovery" of the vial, Morrison was confined to segregated housing, transferred to Clinton Correctional Facility ("Clinton"), and confined in segregated housing there for an additional nine days without a hearing. Morrison claims that his segregation and transfer violated the due process clause; that the way in which he was treated while in segregation violated the Eighth Amendment's prohibition of cruel and unusual punishment; and that when he was transferred much of his property (including his legal papers) was confiscated and never returned. Morrison asserts that he suffered all these deprivations in retaliation for his jailhouse lawyering and persistent agitation for prison reforms.

Madeleine Morrison alleges that, as a result of Deputy Superintendent Keenan's complaint to the State Police, she was falsely arrested and tried for promoting prison contraband. After two days of trial before a jury, all charges against her were dismissed pursuant to C.P.L. § 170.55; on September 27, 1979, the court issued an order terminating the charges in her favor. Mrs. Morrison also claims she was cruelly and unusually punished by the manner in which her husband was treated, and by the premeditated maliciousness of her arrest.

Plaintiffs filed their complaint on March 22, 1979; at that time, Mr. Morrison was still in prison, and they were without counsel. The original complaint named only Eugene S. Lefevre, Richard Hongisto, William Gard, Kevin McNiff, Arthur Leonardo, and J.E. Sullivan as defendants. On May 10, 1979, Mr. Morrison was released from prison. In response to plaintiffs' request for assigned counsel, the court appointed Dennis Lewitas, Esq., who accepted the case in early January 1980. Discovery proceeded slowly, in part because of counsel's other commitments, in part because of the nature of the charges made. On April 15, 1980, the plaintiffs were ordered to amend their complaint to conform it to the allegations made in their memorandum in opposition to defendants' motion to dismiss. Plaintiffs submitted an amended complaint on July 23, 1980, which added the following defendants, all of whom were employees of the New York State Department of Correctional Services: David Harris, Joseph

Keenan, Daniel Senkowski, Frederick Royce, "John" Gilroy, and "John" Alston.

Plaintiffs waived a jury, and when the trial began defendants' counsel moved to dismiss the case against most of the twelve defendants named. An exchange of views made clear that records in the defense's possession showed that plaintiffs had named some defendants who had nothing to do with their complaint but had failed to name others at least potentially implicated by the evidence.

To avoid a miscarriage of justice, the court granted the plaintiffs' request for a continuance or alternatively a mistrial, on the express understanding that plaintiffs would be permitted further discovery and an opportunity to attempt to amend their complaint both to include defendants who the evidence suggested might have been involved in depriving them of their constitutional rights and to exclude those defendants who were not connected to their claims.

Plaintiffs propounded interrogatories on March 10, 1982; the defendants responded on June 16, 1982. Through these interrogatories, and the discovery of duty roster lists, plaintiffs learned which officers of the six hundred working under Deputy Superintendant Keenan's control might have had contact with the package, including the officers who first discovered the vial of fluorescent ink, and the officer who charged Morrison with possession of marijuana, another item of contraband which Morrison claims was "planted."

■ On October 7, 1982, plaintiffs filed a proposed amended complaint, dropping defendant Senkowski and adding fourteen defendants, all of whom were employees of the Department of Corrections at the time of the incident. The court accepted the second amended complaint, but deferred ruling on plaintiffs' request that the amendment be permitted to relate back to the time the original complaint was filed. Defense counsel objected to permitting the charges to relate back, arguing that the newly named defendants would be prejudiced by such a ruling, since the statute of limitations had run with respect to all of plaintiffs' claims before the second amended complaint was filed.

Relation back of amendments is governed by Fed.R.Civ.P. 15(c), which allows the amendment to relate back to the date of the original pleading "[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." The claims the Morrisons raise in their second amended complaint meet this test: they allege roughly the same injuries as those alleged in their first amended complaint (which was filed within the applicable period of limitations); the only significant differences are that they explain precisely why the discovery of the vial of fluorescent liquid by itself deprived them of their constitutional rights and they name as defendants the officers actually responsible for the "plant."

To add the defendants named by the second amended complaint, Rule 15(c) has two additional requirements. First, the Morrisons must show that the new defendants "ha[ve] received such notice of the institution of the action that [they] will not be prejudiced in maintaining [their] defense on the merits ...." Second, they must show that the defendants "knew or should have known that, but for a mistake concerning the identity of the proper part[ies], the action would have been brought against [them]." These latter requirements concern notice and prejudice: were the new defendants sufficiently aware of the action during the period before the statute of limitations had run that they will not be prejudiced by now having to defend themselves?

In this case, these requirements have been met. When a group of state officials are represented by the same lawyers—as all the defendants, old and new, in this case are—a court is entitled to find that the new defendants received constructive notice that satisfies Rule 15(c). *See Kirk v. Cronvich*, 629 F.2d 404, 407–08 (5th Cir. 1980); *Florence v. Krasucki*, 533 F.Supp.

1047, 1054 (W.D.N.Y.1982); *Mitchell v. Hendricks*, 68 F.R.D. 564, 567 (E.D.Pa. 1975); *Ames v. Vavreck*, 356 F.Supp. 931, 942 (D.Minn.1973). Moreover, the Morrisons' failure to name several of the most culpable defendants in their timely complaints was caused by those defendants' attempts from the outset of this episode to suppress the true facts about what occurred. In seeking to retaliate against an active jailhouse lawyer like Thomas Morrison, they knew that if he discovered their actions he would probably sue them. The state also slowed plaintiffs' discovery of the names of the responsible officers by making a meritless motion to dismiss, while withholding from pro se plaintiffs the evidence they needed in order to know against whom their complaint should have been addressed. Nor was any defendant prejudiced by the passage of time, in the sense contemplated by Rule 15. As the findings below show, these defendants' contemporaneous written statements alone provide a sufficient basis for finding them liable. The language of Rule 15(c) and the interests of justice therefore strongly support granting plaintiffs' motion.

Trial on the second amended complaint began on January 17, 1983. After the evidence had been presented, the charges against defendants Jones and Alston were dismissed without prejudice, and those against defendants Lefevre, Hongisto, McNiff, McGuire, Royce, Bissonette, Grey, Miller, Rafaniello, and Valdes were dismissed with prejudice. Because the evidence suggested that the Morrisons had been framed, and because the claims raised complex legal questions, the parties were permitted post-trial briefing.

Based on the findings and conclusions that follow, Thomas Morrison has established that he was confined in the Special Housing Units at Green Haven and Clinton and transferred from Green Haven to Clinton in violation of the due process clause. Madeleine Morrison has established that she was arrested and prosecuted for promoting prison contraband in violation of the due process clause. The Morrisons' other claims, involving direct violations of

their First and Eighth Amendment rights because of inadequate medical treatment, a "mail watch," and denial of visitation privileges were not proven. Finally, the plaintiffs' claim concerning the loss of personal property following the transfer is properly viewed as a pendent state law claim over which this court declines to exercise jurisdiction.

## I. FINDINGS OF FACT

### A.

On January 3, 1972, plaintiff Thomas Morrison, a fifty-one-year-old black man, was convicted of second-degree murder and given a sentence of twenty years to life. At his criminal trial, Morrison claimed that the victim, Walter Boyd, had burglarized his home and threatened his common-law wife and their child; that upon returning home and discovering what had happened, he and a friend, Edward Davis, set off to find Boyd; that both Morrison and Davis were armed; and that, when they found Boyd, Davis killed him. Both Davis and Morrison had been indicted, but by the time of trial Davis had fled the jurisdiction. Morrison was prosecuted under alternative theories: either he had fired the murder weapon (his statement that he had been armed was admitted at trial) or he had aided and abetted Davis. The jury returned a general verdict of guilty. *See* Plaintiffs' Exh. 53.

Morrison was initially sent to the Ossining Correctional Facility, a high-security prison. Two years later he was transferred to Clinton, and thereafter to Green Haven, a somewhat less high-security environment where he spent five years. While at Green Haven, Morrison obtained the help of an attorney whose efforts ultimately led to his release. Edward Davis was eventually arrested, tried, and convicted for the murder. At Davis' trial, an FBI agent testified that Davis had admitted having fired the gun that killed Boyd. Morrison moved for a new trial on March 10, 1976, but his request was denied. The next year, Morrison learned that a ballistics

report made a week after the killing, showing that the bullet that killed Boyd had not been fired from Morrison's gun, had not been given to Morrison's trial lawyer, despite the attorney's *Brady* motion. Morrison made another motion for a new trial, on March 30, 1977, but this motion was also denied.

Davis' conviction was reversed on appeal during the spring of 1977 because his confession was found inadmissible. On remand, he pled guilty to manslaughter and received a conditional discharge. Morrison's *pro bono* attorney, Robert Boehm, discovered this disposition sometime early in 1978, and decided to petition for federal *habeas corpus* relief. Boehm Tr. at 7–8.[*] Boehm filed the petition in late fall 1978, and immediately began negotiating with the Kings County District Attorney's office. In January or February 1979, they reached an agreement that the case would be remanded to state court and that Morrison's sentence would be reduced to one of 8⅓ to 25 years. Boehm Tr. at 8; T. Morrison Tr. I at 3–4. Pursuant to this agreement, Morrison was resentenced, and then released in May 1979.

Throughout 1978 and early 1979, Boehm was in frequent contact with both Thomas and Madeleine Morrison. During that period, he and the Morrisons were optimistic that the collateral attacks on Morrison's conviction would soon be successful. Boehm Tr. at 13–14; *see* Plaintiffs' Exh. 54.

### B.

■ Madeleine Morrison, who is now fifty-four years old, met Thomas Morrison in August 1974 while he was incarcerated at Green Haven. They were married in November 1977. M. Morrison Tr. at 5–6. She visited her husband at Green Haven two to three times a week, and regularly brought him packages. *Id.* at 6–7. She seems a solid and deeply religious woman. She has worked steadily for over twenty years in the Post Office, and holds a position as supervisor (GS–15). Other than the charge involved in this case, she has never had any trouble with the law.

Thomas Morrison was in many respects a model prisoner. In his March 28, 1978 letter recommending clemency for Morrison, defendant David R. Harris, the Superintendent of Green Haven, characterized Morrison as "a very talented and serious individual .... generally mindful of facility policy and regulations and ... a very cooperative individual." Defendants' Exh. W. Since his release in 1979, he has never been accused of violating his parole, and he has maintained a job as a bus driver. T. Morrison Tr. I at 4–5.

Until his alleged smuggling attempt, Morrison had never been accused of any threatening conduct. The only offenses contained in his seven-year prison record were for possessing some unauthorized items in his cell. *See* Defendants' Response to Plaintiffs' Interrogatories Nos. 1 & 3 (which, if they were not made part of the record at trial, are now admitted). His prison record otherwise reflects the confidence placed in him by prisoners and prison administrators alike. At Ossining, Morrison helped to establish an external degree program run by the State University and was selected by the inmates of his block to serve on the first inmate liason committee. T. Morrison Tr. I at 6. Defendant Gard, at the time a captain at Ossining, worked with Morrison on the inmate liason committee. At trial, Gard testified that he "never considered him to be an escape hazard or a particularly dangerous inmate. He did not rise, in my consciousness, that way." Gard Tr. at 14.

After serving two years at Ossining, Morrison was transferred, first to Clinton and then, six months later, to Green Haven. His first job there was in the accounting office. T. Morrison Tr. I at 14–15. He was given positions of increas-

---

[*] Testimony is cited by the name of the witness and the page on which that testimony appears. Each witness' testimony is separately paginated. Because the testimony of Thomas Morrison and

Joseph Keenan appears in more than one place, their testimony is indicated as T. Morrison Tr. I, Tr. II, and Tr. III, and Keenan Tr. I. and Keenan Tr. II.

ing trust and confidence. From 1976 until the episode that gave rise to this suit he was the deputy superintendent's "runner." *Id.* at 30. As a "runner," or messenger, Morrison had virtually free access to the entire east side of Green Haven. *Id.* at 32–34.

Morrison also won the confidence of other inmates. He helped initiate a self-study program, *id.* at 15–16, a support program for inmates' families, *id.* at 16–17, and a special program called "Project House of Tomorrow," to help inmates serving long terms, *id.* at 17–18. He also served three terms on the inmate liason committee. *Id.* at 17. Finally, Morrison established a small retail jewelry business through the hobby shop. The ten percent markup he added to the wholesale price of the goods was contributed to an inmate "slush fund"; Morrison himself made no profit from the venture. T. Morrison Tr. III at 62–63.

While Morrison behaved properly in prison, he also caused a lot of trouble. He was an active litigant and jailhouse lawyer. He filed some 30 to 50 *pro se* actions challenging conditions within the prison and alleged misconduct by prison guards. T. Morrison Tr. I at 24–26. In addition, he frequently aided other inmates in their own cases. *Id.* at 24. He testified without contradiction that Article 78 petitions he filed on behalf of other inmates, relative to sentencing, resulted in eleven of them being released from Ossining. *Id.* Perhaps Morrison's most significant case was *Douglas v. Ward,* Civ. No. 77–2559, in which Morrison and three other Green Haven inmates succeeded in overturning the Correction Department's practice of neither paying interest on prisoners' savings accounts nor allowing prisoners to deposit their money in outside interest-bearing accounts. *See* Plaintiffs' Exhs. 32, 32A; T. Morrison Tr. I at 19–21.

These activities made Morrison well known among both the prisoners and the administration. Some members of the administration treated Morrison's activities as a "joke." T. Morrison Tr. I at 18. Keenan viewed him as a "mild irritant," Keenan Tr.

II at 34, a "troublemaker," and a "two-by-four jailhouse lawyer," T. Morrison Tr. III at 21. The other inmates viewed him with respect. T. Morrison Tr. I at 21. All knew him well, and he was far too intelligent to plan an escape by using fluorescent ink to pass through the locked gates. His successes in court also gave him substantial and credible hopes in September 1978 of soon being released legally.

Defendants suggest that Morrison planned to escape in September 1978, because his request for conjugal visits had recently been rejected. This claim is untenable. Morrison's letter to Deputy Commissioner McNiff requesting conjugal visits illustrates the humor, perspective, and constructiveness of Thomas Morrison's approach to the rigors of prison life. After Morrison learned that inmates at Green Haven were unable to participate in the visitation program he wrote McNiff:

Upon inquiries further, by my wife, she has learned, not only of the criteria, locale and procedures to the program, but that inmates were transferred from one facility to those nearby for the thirty (30) hours. When the visitations were concluded the inmate was returned to his designated facility—"quite elated if I might add, big grin on my face." Just such an opportunity and privilege is precisely what I am certain the "Doctor" would prescribe right about now (smile). I know your [*sic*] grinning at this letter Mr. McNiff, but seriously sir; recently, after quite a bit of problem and hassle, as I wrote and told you earlier, I was married to my "first" childs mother—it's a long story, but my wifes unreal, like determination beyond your wildest imagination; anyway, we would appreciate the privileges of this programs activities to better improve and strengthen our relationship, though I doubt very much if it could ever be actually broken again if you were to meet my wife Mr. McNiff.

We do not meet the criteria wherein it is alleged to be designed to provide "Young" adults with a means and vehicle to retain family ties because we are both

of the same age, and consequently considered as matured adults. But, if I may be candid here, like listen. When a man ceases to look, or fail to contain new ideas, then he's ready for the rocking chair—I like to think that we bow to youth, with grace and deep regards for our own to such an extent that we should not be marked off the calendar of living, loving humanbeings because of our age. Could you aid us here in some way? Whatever consideration you can extend to me in this matter would be deeply appreciated.

In writing you this request for the considerations you will notice that I have taken the concern in such a degree as to copy officials of this facility as well, (would'nt [*sic*] wish to incur anymore ire than necessary, rigjt? [*sic*]).

Defendants' Exh. X. The plaintiffs' testimony and Morrison's record at Green Haven show that they were not the kind of people to undertake a plot like the one of which they were accused.

### C.

In July 1977, defendant Joseph Keenan was appointed Deputy Superintendent of Security at Green Haven. Shortly afterward, Morrison's relations with the prison administration began to deteriorate. Morrison's first real encounter with Keenan involved a proposed list of visitors for a Jay Cee field day event, a group of which Morrison was a director at Green Haven. Keenan reacted negatively to the list, stating "Oh, I see you're HMIC [Head Man in Charge]." T. Morrison Tr. I at 55. Keenan disapproved the list, and told Morrison that "he had heard a lot about me and, you know, he was going to keep a close eye on me and et cetera, et cetera." *Id.* at 56. Keenan also changed Morrison's job status, making him block porter instead of the Deputy Superintendent's runner, soon after Morrison's victory in the law suit against Keenan and others for refusing to deposit inmate funds in interest-bearing accounts. *Id.* at 51. In August 1978, a few weeks prior to the incident involving the fluorescent fluid, Keenan called Morrison into his office and ordered him to stop selling jewelry through the hobby shop. Morrison told Keenan that he had been given permission by the package-room officer to bring in and sell the jewelry, but Keenan told him that the administration would confiscate the jewelry until Morrison decided what to do with it. *Id.* at 40–41. At that meeting, Morrison testified, Keenan also made the following proposal:

[H]e said, "You have a pretty good job here."

I said, "Yes, sir."

He said, "Do you want to keep your job?"

I said, "Certainly I want to keep my job."

He said, "You know a lot of things about this facility. You get around quite a bit. And there are things that we need to know in security that you could perhaps inform us about. What do you feel about that?"

. . . .

. . . I said, "I can't do nothing like that. I have to consider where I am and what happens to me when you are through with me and you throw me back to the inmates . . . . From then on my whole life is segregation and isolation."

*Id.* at 41–42. Keenan did not deny suggesting that Morrison become an informer:

Q. Did you ever tell Tom Morrison that there was a drug problem that was well known in the institution and that he of all people, as a runner . . ., would be in an excellent position to be able to help you in your investigation of that drug problem?

A. Not to my knowledge.

Q. Not to your recollection?

A. Not to my recollection.

Q. Do you ever recollect Tom Morrison saying under no circumstances would he be a party to informing on his fellow inmates?

A. I didn't expect he would.

Keenan Tr. I at 57. These equivocal responses, combined with Morrison's credible testimony, and Keenan's reluctant concession that a conversation in fact took place

concerning the jewelry, *id.* at 58, establishes that the conversation to which Morrison testified actually took place.

### D.

The events that precipitated this lawsuit began in late August 1978, when Mr. Morrison ordered a watch and a battery recharger from Tehan's Wholesale Inc., a mail-order house. *See* Plaintiffs' Exh. 4; Thomas Morrison Tr. II at 60–61. These items were shipped on September 5, 1978, directly to Madeleine Morrison. Plaintiffs' Exh. 4. They arrived at Mrs. Morrison's apartment later that week. M. Morrison Tr. at 21–22. In a letter, Thomas Morrison told his wife that the watch was a present for her, *id.* at 78, from which she assumed that she was to bring the battery recharger with her to the prison. Mrs. Morrison put the package containing the recharger in a drawer where it remained sealed with paper tape until Thursday, September 14, 1978, when she brought it (and a book) up to Green Haven to give to her husband. Mrs. Morrison testified convincingly that she did not tamper with the package in any way. *Id.* at 36–37. Tehan's Mail Order House does not sell fluorescent ink. Plaintiffs' Exh. 51 (arrest report item 13).

On the morning of September 14, Mrs. Morrison traveled to Green Haven. She brought with her a brown paper bag containing the sealed battery recharger and a book for Mr. Morrison. *See* Plaintiffs' Exhibit 5; Gilroy Tr. at 4. Because all packages entering Green Haven were to be "searched thoroughly," Plaintiffs' Exh. 17 (item II.E.), Mrs. Morrison left the package with the guard in the reception area; it was tagged there with Mr. Morrison's name on the outside of the bag. M. Morrison Tr. at 29–30; *see* Plaintiffs' Exh. 1. Mrs. Morrison then went to the visiting room to meet her husband. The bag was placed in a locked hamper, Plaintiffs' Exh. 3, to be transported to the package room for inspection. *See* Gilroy Tr. at 3–4; Keenan Tr. I at 17. After inspection, if a package has been approved, a notation is made on the package card, *see* Plaintiffs' Exh. 5, and the package is delivered to the

inmate. If a package is unacceptable, two possible courses of action exist. When the contraband is innocuous, but forbidden by prison regulations—such as home-prepared food, *see* Plaintiffs' Exh. 17 (item IV. 1.)—it is tagged and returned to the front gate, where the visitor is allowed to pick it up when he or she leaves the prison. Keenan Tr. I at 18–20. When the contraband is "serious," i.e., when it is either illegal or in some way dangerous to prison security—like the fluorescent ink at issue in this case—the contraband is confiscated and the package room notifies the Superintendent. *Id.; see* Plaintiffs' Exh. 17 (item II. E.).

Officer Robert Gilroy was the correction officer in the package room who first inspected the package Mrs. Morrison had brought with her on September 14. Gilroy was uncertain whether the battery recharger box was sealed, but he remembered that the box was closed. Gilroy Tr. at 4. Because battery rechargers were not on the list of items normally allowed into the prison, *see* Plaintiffs' Exh. 17, Gilroy went to Deputy Superintendent Keenan's office to find out what to do. Gilroy Tr. at 6. At this trial, neither Gilroy nor Keenan could remember whether Gilroy brought the recharger with him. At Mrs. Morrison's trial, however, which occurred only six months after the incident, Gilroy testified that he had brought the recharger to Keenan's office. *See* Gilroy Tr. at 8–9. Given the small size of the box and the lack of any established policy as to such an item, Gilroy's earlier and more definite recollection seems more plausible.

Keenan decided not to allow the battery recharger into the prison. Officer Gilroy then returned to the package room and placed the box containing the battery recharger back into the paper bag. He prepared two return slips. He stapled one to the paper bag and put the bag back into the hamper to be returned to the front desk. He took the other slip into the visiting room at approximately 11:30 a.m., during the course of Mrs. Morrison's visit, and informed Mr. Morrison that the battery recharger was not approved and that Mrs.

Morrison would have to take it with her when she left. Gilroy Tr. at 7, 16–19; M. Morrison Tr. at 32; T. Morrison Tr. II at 62–63.

Mr. Morrison protested the decision, arguing that he had previously been given permission to have a different recharger in his cell. When Gilroy cut short the discussion by telling Morrison that he was going off duty, Morrison told his wife: "Don't take it home. Leave it. We will get it straightened out." M. Morrison Tr. at 32; see T. Morrison Tr. II at 62–63. Mrs. Morrison followed these instructions. When she left the prison at 3:30 that afternoon, she saw the bag sitting out in the package room for her to take, but she left it behind. M. Morrison Tr. at 31.

The vial of fluorescent liquid was not in the battery recharger when Mrs. Morrison left Green Haven on September 14. The following considerations, in addition to the Morrisons' credible testimony, support this determination. First, it would have been irrational for someone intent on smuggling escape paraphernalia into Green Haven to secrete it in an item that was not on the list of objects normally allowed into the prison, since an unusual item would necessarily have been subject to more searching scrutiny. An inmate like Thomas Morrison, who had obtained special permits for a variety of items, see Plaintiffs' Exhs. 42–44 (permits for, inter alia, musical equipment), would certainly have been aware of the greater risks involved in bringing in nonstandard items, and would have had many opportunities to bring the vial into prison in a less suspicious item. Thus, even if Morrison had wanted to escape, or to aid in an escape, he would not have used the battery recharger to smuggle the ink. Second, neither Gilroy nor Keenan noticed anything about the recharger that led them to suspect it contained contraband. Gilroy's job was to inspect packages thoroughly; despite his removing the recharger from its packaging, walking to Keenan's office, examining the item with Keenan, returning to the package room, and repackaging the recharger, he did not notice the rattle or the vial which Officer Flecha later heard

and saw. See Flecha Tr. at 22. Third, Morrison would not have directed his wife to leave the package at the prison after it had initially been excluded if he knew contained the vial, since that would have made the vial's discovery more likely.

## E.

Nonetheless, a vial of fluorescent ink similar to the ink used to stamp visitors' hands was found sometime around 5:00 p.m. that day. Three of the defendants—Officers Flecha, Daverso, and Panarello—were involved in the discovery. Their written and oral reports of the discovery precipitated all the events which followed. The evidence convincingly establishes that one or more of them "planted" the vial inside the battery recharger.

At trial, Correction Officer Wilfred Flecha testified that he had been assigned to the front reception area, see Plaintiffs' Exh. 1, on the afternoon of September 14. After the traffic of visitors had died down, around 4:30 p.m., he noticed that three packages, one of them Morrison's, had been left behind by visitors. Flecha Tr. at 4–5. He then opened all three packages, solely to identify and discard any perishables. Flecha Tr. at 10. (The packages had already been searched for contraband.)

Flecha testified that at the very "moment" he opened the box contained in Morrison's bag, he heard "something rattle, something loose inside." Id. at 11. He then looked through a "porthole" in the recharger and noticed a small, glass container which resembled a "small vial of perfume." Id. at 15. Just then, Officers Panarello and Daverso appeared; they suggested that he open the recharger. He unscrewed the back and removed the vial. When he had removed it from the recharger, his "suspicion was further aroused by the fact that [the liquid] appeared just like the liquid that they used in the normal practice of the security stamp during the day." Id. at 16. After he had put some of the liquid on his hand and tested it under the ultraviolet light, he reported the dis-

covery to the watch commander, Lieutenant Napolitano. Napolitano told him to return the recharger to the package room. Flecha testified that he put the vial back into the compartment of the battery recharger, screwed the back on, placed the battery recharger into its box, and put the box back into the paper bag in which it had arrived. *Id.* at 40–41. He then marked the bag with an "evidence" tag, obtained the keys to the package room from the "arsenal window"—where items of high security are stored, including the fluorescent ink used to stamp the hands of visitors entering the prison (*see* Keenan Tr. II at 10, 13)—placed the bag on a table in the package room, and left, locking the door behind him. Flecha Tr. at 46.

At approximately 8:30 the next morning, Edward Boulanger, the officer on duty in the package room, received a telephone call from Panarello. Panarello told him to open the recharger. When Boulanger unscrewed the back, he found the vial of fluid. He put some of the liquid on his hand and passed his hand under the ultraviolet light at the front gate. Because the fluid glowed under the light, he brought the vial to Deputy Superintendent Keenan. Boulanger Tr. at 3–4, 10–11; Plaintiffs' Exh. 19 (Boulanger's contemporaneous report to Keenan).

The testimony of defendants Flecha, Daverso, and Panarello concerning the discovery of the vial of fluid was not credible. All three appeared uneasy, even shifty. Flecha admitted that normally he would not have inspected the package once he had determined that it contained nothing perishable. *See* Flecha Tr. at 10, 22. Gilroy and Keenan had both denied noticing anything suspicious about the recharger that might have suggested contraband inside it. Keenan Tr. II at 22; *see* Gilroy Tr. at 6–7. Thus, Flecha knew that he had to provide some explanation for his decision to perform an unusually close inspection. At the trial, he ascribed the decision to his hearing something rattle inside. Yet in the memorandum which he wrote to Keenan the day after the incident (when he had no reason to believe that any special justification for the search was necessary), he made no mention of any rattle. Plaintiffs' Exh. 24.

Similar inconsistencies exist in Flecha's testimony concerning the actual discovery of the vial. Initially, he claimed that he saw the vial inside the recharger, "conferred" with Daverso and Panarello who had arrived "at that moment," opened the vial, noticed liquid that looked "just like" the fluid used to identify visitors, tested it by putting some on his hand, and went to inform Lieutenant Napolitano, the watch commander. Flecha Tr. at 15–16. But after being confronted with his contemporaneous written statement to Keenan (Plaintiffs' Exh. 24), Flecha changed his story. He then stated that he had gone to Napolitano with his suspicions and that Napolitano had directed him to return the box to the package room. Despite this direction, Flecha claimed that he opened the recharger, found the vial, tested the liquid, and then informed Napolitano of what he had discovered. Flecha Tr. 27.

Efforts to obtain meaningful testimony from Panarello or Daverso were unsuccessful. Their accounts of the circumstances surrounding the discovery often contradicted their contemporaneous statements. *Compare, e.g.,* Plaintiffs' Exh. 27 (Daverso's contemporaneous statement that he and Panarello noticed the package on the way out of the prison) *with* Daverso Tr. at 19 (testifying that he first saw it on his return). Panarello claimed that he could remember virtually nothing about the episode, stating that "[t]here are so many reports written during the course of a man's career, how can you remember every one ...?" Panarello Tr. at 36. That disclaimer was incredible. First, this episode was unique, as both Keenan and Panarello admitted. *See* Keenan Tr. II at 33; Panarello Tr. at 36. Second, Panarello's memory lapses seem to have been prompted by his realization that the entire story which the three guards had concocted would dissolve under close examination.

Moreover, the testimony that could be coaxed out of or admitted through the

three officers was also conflicting. Daverso's September 18, 1978 statement to Lieutenant Seitz mentions neither Lieutenant Napolitano nor Flecha's leaving the room with the package, and indicates that he and Panarello suggested that Flecha open the package. *See* Plaintiffs' Exh. 27. Flecha, however, testified that Lieutenant Napolitano was involved in the decision whether to open the box. Flecha Tr. at 16. Similarly, while Flecha testified that he had notified the watch commander, *id.; see* Plaintiffs' Exh. 24, both Panarello and Daverso stated that they decided to postpone notifying any of their superiors until the morning, *see* Plaintiffs' Exhs. 25 & 27.

The stories told by the three officers and their demeanor on the stand strongly support the inference that they were responsible for "planting" and then "discovering" the vial of fluorescent fluid. As Judge Learned Hand observed in *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir.1952) a witness' implausible denials can lead a court to infer the true state of affairs:

> Moreover, such evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.

*See also In re Bebar*, 315 F.Supp. 841, 844 (E.D.N.Y.1970) (demeanor of witness may satisfy trier of fact not only that testimony is not true but that the truth is the opposite of witness's testimony). Reliance on their incredible denials is appropriate here, since their involvement in the "plant" was amply corroborated.

In addition to the defensive, unpersuasive manner in which they testified about the incident, the following flaws exist in the defendants' accounts. First, Flecha's "immediate" suspicion that the liquid in the vial was fluorescent fluid and his decision to put the liquid on his hand without taking any precautions bespeaks an uncanny certainty as to the outcome of his investigation. Flecha acted as if he already knew what was in the vial. Second, the casual attitude the officers displayed toward a putative escape plot, potentially involving a number of prisoners, is inconsistent with a good faith belief that such a scheme was afoot. Both Daverso and Panarello, in identical language, informed Lieutenant Seitz that they had told Flecha to bring the recharger to the package room "and we would bring it to our superior's attention in the morning." Plaintiffs' Exhs. 25 & 27. They made no effort to check on Morrison. Although Flecha claimed at trial that he had gone to Lieutenant Napolitano that night, the first notice the administration received about the discovery of the fluid seems in fact to have been the next day, when Panarello telephoned Boulanger who informed Keenan. *See* Plaintiffs' Exh. 19; Keenan Tr. I at 41–42. Defendants offered no statement or testimony from Napolitano to contradict this inference. If the officers had honestly believed Morrison was plotting an escape, they would have informed someone in authority at the facility before they left for the evening. They knew no threat of escape existed.

Furthermore, the fluorescent compound in the vial was chemically identical to the compound used at Green Haven for stamping visitors' hands. Dennis Kebabjian, a forensic scientist from the New York State Police Scientific Laboratory, performed two sophisticated tests on the liquid—a thin layer chromatography and a spectrofluoremetry. He concluded that the fluorescent materials in the two liquids were the "same compound." Plaintiffs' Exh. 51 (Laboratory Report at 2). Although these tests did not determine definitively whether the liquid from the vial came from the same batch as the arsenal room sample, they were sufficiently refined for various available fluorescent substances to have shown up differently. Since chemically different substances fluoresce similarly under ultraviolet light, *see* Anderson Tr. at 33, it would have been unnecessary, as well as difficult, for Morrison to obtain an identical fluorescent ink. On the other hand, it was

easy for Flecha to get the ink from the arsenal room, or by asking at the window to replenish one of the pads kept in the visitors' room. Keenan Tr. II at 13, 17–18.

In light of all these considerations, by far the likeliest explanation for the vial's presence in the recharger was that Flecha saw the package with Morrison's name, knew Morrison as a troublemaker and prison leader who deserved to be taught a lesson, got the idea (perhaps from Daverso or Panerello) of putting some contraband in the recharger, obtained some fluid from the arsenal room, poured it into a perfume sample bottle, opened the recharger, inserted the bottle, and then pretended to find it.

### F.

When Keenan received the report that the vial of fluorescent fluid had been found in the recharger left for Morrison, he ordered that Morrison be placed in the prison's Special Housing Unit ("SHU"). Early on the morning of September 15, 1978, Sergeant Sanford and three other officers went to Morrison's cell and took him to the SHU. T. Morrison Tr. II at 63. Sometime later that day, Lieutenant Seitz interviewed Morrison, apparently solely to find out whether his wife had left the recharger for him. See Plaintiffs' Exh. 20; T. Morrison Tr. II at 67–69; Keenan Tr. II at 25. Keenan then spoke to Deputy Commissioner for Correctional Facilities William Gard, whose office had the final responsibility for ordering all transfers, see Gard Tr. at 14, about the security problem Morrison posed, and obtained authority for a transfer. That night, Morrison was transferred to Clinton Correctional Facility, some three hundred miles upstate. T. Morrison Tr. II at 69.

While Morrison was locked in the SHU, a search of his cell turned up a piece of a marijuana cigarette in the pocket of a shirt. This too was reported as a disciplinary infraction. See Plaintiffs' Exh. 21. Morrison denies ever having possessed the marijuana; he "speculat[ed]" that it too had been planted, T. Morrison Tr. II at 88–89, although no probative evidence was presented beyond his denial.

During the day he spent in SHU at Green Haven, Morrison received no information about the charges against him. Id. at 68–70. The written notice he received informed him only that a "misbehavior report" had been filed. On the line on which the reporting officer is supposed to detail the rules violated Lieutenant Seitz merely put "investigation"; he also left blank the line on which the location of the incident was to be filled in. Defendants' Exh. R. At trial, Keenan explained that this had been done to permit further investigation before a charging decision was made. Keenan Tr. II at 24. But Morrison was not even informed of what charge was being investigated. Furthermore, despite his professed need to give a wholly unspecific notice to Morrison, Keenan apparently was certain enough of what had happened to call Gard and set in motion the transfer process, and, even more surprising in light of this professed caution, to report the incident to the State Police and swear out a complaint against Madeleine Morrison. See Plaintiffs' Exhs. 9 & 51. The investigation consisted, moreover, solely in getting statements from the officers involved. Keenan never provided Morrison an opportunity to respond. While the evidence fails to establish that Keenan in any way participated in the plot to get Morrison into trouble over the fluid, he seems to have regarded the serious charges against Morrison as a legitimate opportunity to wash his hands of a particularly troublesome inmate. By contacting Gard after this one-sided investigation, Keenan virtually assured Morrison's removal from Green Haven. See Gard Tr. at 17; Plaintiffs' Exh. 52 (Gard affidavit stating transfer ordered to foil planned escape).

On September 16, 1978, Morrison arrived at Clinton. He was permitted to take with him a bag of personal belongings, but forced to leave behind most of his possessions, including electronic equipment, the costume jewelry, and legal papers. T. Morrison Tr. II at 70. Upon arriving at Clinton, Morrison was put into the punitive isolation section and instructed to speak

with no one. *Id.* at 74–77. Morrison testified that he felt extremely cold throughout his confinement in segregated housing, and that despite his repeated requests the officer on duty refused to close an open window. He said the temperature felt as low as 14°F. *Id.* at 77. The defense proved that the low for those days was 27°F, and that the usual temperatures during that period were moderate. At some point during this confinement, Morrison received a memorandum from J.E. Sullivan, Deputy Superintendent for Security at Clinton, stating that charges were pending against him. The memorandum did not state or identify by rule number, however, what the charges were, or when a hearing would be held. *Id.* at 83-85. A "mail watch" was placed on all of Morrison's mail and his visitation rights with his wife were cancelled. *See id.* at 99–100. Despite the mail watch, however, Morrison continued to receive mail.

Morrison remained in SHU at Clinton at least until September 24, 1978, nine days after he had been placed in SHU at Green Haven. By October 4, he was switched to "keeplock" status. *Id.* at 88. Soon after, probably on October 7, he was given a hearing by the Adjustment Committee at Clinton. He was not given a counselor, and he was not allowed to present evidence or to question any witness who might have been called. *Id.* at 89–92. The only infraction raised at the hearing concerned the piece of a marijuana cigarette allegedly found in a shirt pocket in Morrison's cell. When he denied any knowledge about the incident, he was told "Well, step outside. We'll render a decision on that." *Id.* at 90. The Adjustment Committee Report reflects the cursory nature of the proceedings against Morrison. No further investigation of either charge was made. The charge made by Lieutenant Seitz involving the fluorescent ink was dismissed without findings or conclusions. Morrison's keeplock status was continued on the marijuana charge pending a superintendent's proceeding. Plaintiffs' Exh. 23. At trial, Morrison testified without contradiction, however, that the superintendent's proceedings on

this latter charge were dropped, since the penalty was confined to time already served. T. Morrison Tr. II at 92–93.

Upon being released from keeplock, Morrison sought to recover the property he had left behind at Green Haven when he had been transferred. He filed an inmate claim form with the Department of Correctional Services, itemizing roughly $3000 of jewelry, musical equipment, clothing, and legal material. Plaintiffs' Exh. 39. Morrison also filed an action in claims court, but later withdrew it. T. Morrison Tr. II at 95. Defendants now argue that some of the items he claimed were not in fact owned by him but rather had been donated to the institution; Morrison was simply permitted to keep them in his cell and use them. At that time, however, the Department offered to send the jewelry to Morrison's home. Defendants' Exh. S. Morrison sent a mail order to cover the cost of postage, but the items were never returned. T. Morrison Tr. II at 94.

### G.

The battery recharger episode damaged Madeleine Morrison as well. Mrs. Morrison first learned of the charges against her husband and her husband's transfer to Clinton on Sunday, September 17. That day, she appeared at the prison to attend a previously scheduled picnic and was informed that her name had been removed from the list of authorized visitors. When she asked for an explanation, she was told "[b]ecause your husband is not here." M. Morrison Tr. at 34. She then walked around the prison to the front gate, where the watch commander told her that her husband was at Clinton, because "some sort of contraband" had been brought up on Thursday. *Id.* at 35. Mrs. Morrison protested to him that on Thursday she had been "the only one that came up and all I brought him was a paperback book and a battery recharger." *Id.* She was soon able to confirm the officer's statement that her husband was in Clinton, but could obtain no other information at the prison. Having no other way to get home, she

waited until 3:00 p.m. in the van that had brought her to the prison, and then returned to New York City. *Id.* at 38–39.

The next day, Mrs. Morrison began a frantic effort to discover what had happened to her husband: "Oh, my God. I called Clinton. I called Albany. My phone bill was tremendous." *Id.* at 39. When she spoke to Keenan on Tuesday, he disingenuously told her that, because Morrison's records had been sent to Clinton, he could not tell her the cause of the transfer. Plaintiff's Exh. 54. Later that day, she finally was told that the reason Morrison had been transferred was that a vial had been found in the battery recharger. M. Morrison Tr. at 40. Mrs. Morrison's reaction was in keeping with her innocence of any involvement in an escape plot:

> And of course I became very—I was very emotional. I said over the phone, and I also wrote letters to that effect, "Well, if they thought that I had done it, why didn't they arrest me?" How is it all of a sudden this thing mysteriously appears, etc.? I was highly indignant. I don't even—I can't even begin to express to you how angry I was and how hurt I was.

*Id.*

A letter that Madeleine Morrison sent to Commissioner Hongisto and Deputy Commissioner Gard on September 20, 1978, like the one her husband wrote to Gard concerning conjugal visits, exemplifies the kind of person she is. In responding to the charge that contraband had been in the package, she wrote:

> This is an outrageous lie!! I brought my husband two items on Thursday: 1) a pocketbook called "Passages" 2) a battery re-charger. *Nothing else....* I brought the battery re-charger up on Thursday. If there was something wrong or something of contraband in the package how is it that I was not arrested on Thursday, my visit terminated and my husband taken away for discipline?? How was it that I was not informed of these events when I came to visit on Sunday?? But most of all I would like to know why my husband is being harassed in this manner?? ....

> I think that the enviousness of some people at Greenhaven has caused someone to plant some sort of contraband in my husband;s [*sic*] package on Thursday or Friday. I wish that a thorough investigation be launched into this matter. Having him at Clinton Corr. Facility will work a real hardship on me as I am the sole support of my children and cannot get time off from my job that easily to see my husband. We had high hopes for a new trial for him and he only had two more years to go before he would have been eligible for considerations of clemency.

> His record in the facility has been very good up to now and he has made positive contributions to programs in the facility that would be of some sevice [*sic*] to the inmates in helping them in their rehabilitation. His intelligence and desire to help others has been used for the greatest good since he has been incarcerated. In his capacity as minister (he is licensed and ordained since he has been in prison) he has been of tremendous help to the Protestant, Catholic and Muslim ministry at the facility. Are all these clear-cut efforts at self-rehabilitation to go down the drain?? I appeal to your sense of justice to investigate this matter.

Plaintiffs' Exh. 54. Despite her entreaties, no investigation of the charges or her claim that her husband had been framed was undertaken. Moreover, no one in the Correction Department ever notified the State Police, whom Keenan had informed about Mrs. Morrison's role in the alleged escape plot, of Mrs. Morrison's communications with them. *See also* Plaintiffs' Exh. 49 (decision at Clinton to notify State Police if Mrs. Morrison came to visit the institution was not countermanded even after Morrison was released from SHU). The events which followed strongly suggest that prison officials responded to Mrs. Morrison's claims by arranging to arrest her in an especially painful manner.

Sometime shortly before September 30, 1978, Deputy Superintendent Sullivan informed Morrison that his wife would be allowed to visit him at Clinton. T. Morrison Tr. II at 100. Morrison then invited his wife, whom he had not seen in two weeks. On the night of September 29, Mrs. Morrison took an all-night bus ride from Manhattan to Clinton, and arrived there on September 30, at about 8:00 a.m. M. Morrison Tr. at 42. She was shocked at his appearance: "He looked horrible.... He was despondent, you know, and he looked ill. His eyes—the whites of his eyes were yellow and he looked bad. And I tried my best not to show him how shocked I was at the way he looked, because I wanted to cheer him up." *Id.* at 42, 43.

Approximately thirty minutes later, an officer interrupted their visit and asked Mrs. Morrison to come to the office. Hopeful that "maybe they have something good to tell me. Maybe they will tell me that, you know, he might be transferred or some good word," *id.* at 44, Mrs. Morrison was met by two State Police officers, who had been awaiting her arrival. *See* Plaintiffs' Exh. 11 (warrant issued on September 30). They arrested her on charges of smuggling contraband into Green Haven. For the next several hours, she was driven from Clinton to Plattsburg to Fishkill. Finally, in the early evening, she was arraigned before Judge Ferris of the Beekman Town Justice Court. Plaintiffs' Exh. 51 (State Police Arrest Report at 3); M. Morrison Tr. at 47. The complaint, signed by Investigator McCauley of the State Police stated that the basis for his accusation was "the complain[t] of Deputy Supt. JOSEPH KEENAN." Plaintiffs' Exh. 9. Among other things the complaint in its original form recited that the contraband was "dangerous," and that it "would endanger the safety and security of the said facility." *Id.* After Judge Ferris telephoned Mrs. Morrison's supervisor at work, he released her without bail. M. Morrison Tr. at 52.

Meanwhile, Mr. Morrison waited in the visiting room at Clinton for his wife to return. After two hours, he was informed that Mrs. Morrison had left the institution. Even then he was not told that she had been arrested. He was extremely apprehensive for her safety. T. Morrison Tr. II at 101–02. He did not discover what had happened to her for roughly two days. *Id.* at 103. For the next six months, until her trial, Mrs. Morrison was denied permission to visit her husband, despite her repeated requests, because she was considered a threat to security.

Mrs. Morrison retained a lawyer to represent her on the charge of promoting contraband; it took her some time to pay his fee of $900. M. Morrison Tr. at 56–57. Throughout the pendency of her case, the prison authorities apparently never communicated to the police or prosecutor the dismissal of the contraband charge against her husband. On March 6, 1979, the charge was reduced from the felony of promoting prison contraband in the first degree to the misdemeanor of promoting prison contraband in the second degree. Plaintiffs' Exh. 9. The trial began that day. On the second day, after a few witnesses had testified, the prosecutor trying the case approached Mrs. Morrison's lawyer and negotiated an agreement under which the case was adjourned in contemplation of dismissal. M. Morrison Tr. at 60; Plaintiffs' Exh. 9. Given the facts of this case, the most plausible reason for the prosecutor's decision was that he found the evidence against the Morrisons too flimsy to support a conviction. On September 27, 1979, more than a year after the supposed introduction of contraband, Judge Ferris issued an Order Upon Termination of Criminal Action in Favor of the Accused, and Mrs. Morrison's records were sealed. Plaintiffs' Exh. 12. Mrs. Morrison claims that, as a result of this episode, she was denied supervisory promotions in the Post Office, with a concomitant loss of additional income. M. Morrison Tr. at 63–70.

### H.

The evidence adduced at trial overwhelmingly shows that the Morrisons were the victims of official misconduct. They were

wholly innocent of the charge of smuggling contraband. As the trial unfolded, the demeanor and bearing of the Morrisons and the other evidence produced by the parties made the charges against them appear to be nothing less than a wicked joke.

The very nature of the wrong perpetrated on the Morrisons rendered it unlikely that they would be able to provide direct evidence of who "planted" the vial. The circumstantial evidence, however, establishes convincingly that Officers Flecha, Daverso, and Panarello were responsible for putting the vial into the recharger. Officer Gilroy's uneasy demeanor at trial suggests he was aware that the package had been tampered with after his search, but nothing connects him with the actual "planting." Similarly, no evidence connects Deputy Superintendent Keenan, a professional prison administrator, with the scheme against Morrison before he was notified by Officer Boulanger. He would not have stooped to so crude a plot. Nonetheless, his actions after the reported discovery reflect an indifference to the Morrisons' rights. This indifference stemmed from his disapproval of Mr. Morrison's persistent litigation and agitation for prison reform. He treated the charge as an opportunity to rid himself of a troublemaker. Thus, he requested that Gard transfer Morrison before any effort had been made to discover what exactly had happened, and he ignored the efforts of both Thomas and Madeleine Morrison to present their side of the facts. His report to the State Police triggered the mean, even sadistic, arrest of Mrs. Morrison, although the evidence did not establish that Keenan had any personal involvement in that arrangement.

Morrison's treatment in SHU at Green Haven and Clinton was also painful and unfair. He was kept isolated for at least nine days in uncomfortable surroundings. He was never adequately informed of the charges against him, and never given any real opportunity to respond to those charges. Despite his long confinement, allegedly to permit an official investigation, the authorities made no effort to investigate the events, beyond the initial collection of statements at Green Haven. The decision to keep Morrison in isolation pending an investigation that never took place, especially when considered in conjunction with Mrs. Morrison's treatment at Clinton, likely reflects an intention to punish Morrison for his well known litigation and reform activities.

## II. CONCLUSIONS OF LAW

### A. *Thomas Morrison's Due Process Claims.*

Thomas Morrison claims that he suffered two deprivations of liberty without due process as a result of the planting and "discovery" of the fluorescent fluid. First, he was confined in the Special Housing Unit ("SHU") at Green Haven, and later placed in the SHU and then in keeplock at Clinton. Second, he was transferred from Green Haven to Clinton. Both of these deprivations, he has shown, resulted from malicious or indifferent official conduct, in retaliation for his protected litigation activities and prison leadership. The testimony at trial showed that these changes in custodial status involved "a significant modification in [his] conditions of confinement," *Hewitt v. Helms*, 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983), and inflicted upon him a "grievous loss," *id.* (quoting *Moody v. Daggett*, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976)). This, however, does not answer the question whether Morrison can establish liability under § 1983 for a denial of liberty without due process. The Supreme Court has repeatedly held that not every unpleasant change in status to which a prisoner is subjected violates the due process clause. *Hewitt v. Helms*, 459 U.S. at 467–68, 103 S.Ct. at 869–70; *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979); *Montayne v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976).

To answer this question, two preliminary inquiries are necessary. First, is there a protected liberty interest implicated

in either Morrison's confinement in SHU or his transfer to Clinton? Second, if such an interest exists, was Morrison deprived of his enjoyment of that interest without due process of law? In this case, the answer to each question is yes.

### 1. *Morrison's Liberty Interests.*

 "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. at 466, 103 S.Ct. at 869. There, the Supreme Court explained that "lawfully incarcerated persons retain only a narrow range of protected liberty interests." *Id.* at 467, 103 S.Ct. at 869. As long as a change in the conditions or degree of a prisoner's confinement is "within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Id.* at 468, 103 S.Ct. at 869 (quoting *Montayne v. Haymes,* 427 U.S. at 236, 96 S.Ct. at 2543). Instead, the "extraordinarily difficult undertaking" of running a prison requires that prison administrators be afforded a broad range of discretion. *Hewitt v. Helms,* 459 U.S. at 467, 103 S.Ct. at 869; *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974). Administrative segregation can serve so many legitimate purposes that it is "the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms,* 459 U.S. at 468, 103 S.Ct. at 870.

 The narrow range of protected liberty interests retained by prisoners, however, includes "beyond doubt ... a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977); *see Wolff v. McDonnell,* 418 U.S. at 577–80, 94 S.Ct. at 2985–87; *Procunier v. Martinez,* 416 U.S. 396, 419–422, 94 S.Ct. 1800, 1814–1816, 40 L.Ed.2d 224 (1974); *Ex parte Hull,* 312 U.S. 546, 549, 61 S.Ct. 640, 641, 85 L.Ed. 1034 (1941). The need for broad discretion in prison administration cannot justify direct curtailment of the right of access save in exceptional circumstances. Such circumstances have never been alleged in this case. Nor can it justify bringing trumped up disciplinary charges against a prisoner to punish him for exercising his constitutional rights. "This would allow the government to 'produce a result which [it] could not command directly.' Such interference with constitutional rights is impermissible." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (citation omitted). Thus, although segregation may be a form of confinement which prisoners should expect to experience because of various justifiable administrative needs, prisoners in this nation should not fear the imposition of solitary confinement because they have engaged in litigation and prison reform activities. "Even though a [prisoner] has no 'right' [to remain in the general prison population] and even though the government may deny him [general custody status] for any number of reasons, there are some reasons upon which the government may not rely." *Id.* Retaliation for his litigation and prison reform activities is such an impermissible reason. Morrison's federally created liberty interest, then, does not rest on his right not to be confined in SHU absent good cause; rather, it rests on his right not to suffer any "grievous loss," *Hewitt v. Helms,* 459 U.S. at 468, 103 S.Ct. at 869, because he exercised his federal constitutional rights. The due process required to protect this federally guaranteed liberty interest need be no more formal than that required to protect state-created interests. But it must be sufficient to assure that an allegation of malicious official conduct can be responsibly addressed at some point by the appropriate prison authorities.

*Hewitt v. Helms* also provided guidance for determining whether state law has created a liberty interest. In finding that Pennsylvania law had done so, the Court pointed to the following factors: the state's procedural guidelines "used language of an unmistakably mandatory character, requir-

ing that certain procedures 'shall,' 'will,' or 'must' be employed," *id.* at 471, 103 S.Ct. at 871, and the state prohibited segregation "absent specified substantive predicates— viz., 'the need for control,' or 'the threat of a serious disturbance,'" *id.* at 472, 103 S.Ct. at 871.

■ New York law makes clear that two liberty interests were implicated in Morrison's confinement in SHU. First, he had a liberty interest in not being confined in SHU at all, "absent specified substantive predicates" which were not established in this case. Second, he had a liberty interest in not being confined to SHU or keeplock for as long as he was confined, absent an administrative hearing. The applicable regulation governing admission to Special Housing Units at the time of the incident involved in this case provided, in "unmistakably mandatory" language, that only four classifications "shall" be used in assigning inmates to SHUs: automatic, protective, detention, and adjustment admissions. It further provided that "[n]o variation of these procedures *shall* be permitted *under any circumstances.*" N.Y.C.R.R. tit. 7, § 304.2(d) (1976) (Plaintiffs' Exh. 48) (emphasis added). The only classification into which Morrison could conceivably fit is "detention admission."

■ The subsection of § 304 dealing with detention admissions to SHU provided the "specified substantive predicat[e]" for invoking such an admission: "[i]n cases of misbehavior in the facility, as provided in section 251.6 of Chapter V of the rules and regulations of the department...." N.Y. Admin.Code tit. 7, § 304.4(a)(1) (1976). Section 251.6 provided that a corrections officer could confine an inmate prior to an Adjustment Committee hearing "[w]here an officer has reasonable grounds to believe that ... [the inmate] represents an immediate threat to the safety, security or order of the facility." Although the law in New York is somewhat unsettled as to whether an inmate can be confined in *keeplock* without a prior hearing absent exigent circumstances, *see Bowe v. Smith*, 119 Misc.2d 453, 465 N.Y.S.2d 391 (Sup.Ct.

1983); *cf. Hughes v. Rowe*, 449 U.S. 5, 11, 101 S.Ct. 173, 177, 66 L.Ed.2d 163 (1980) (per curiam), the regulations governing SHU, a more onerous form of confinement, seem on their face to be mandatory. Thus, unless "reasonable grounds" existed to believe that Morrison was "an immediate threat," his confinement to SHU prior to an Adjustment Committee hearing infringed upon a liberty interest.

The facts make clear that no reasonable ground was present to support an officer's belief that an immediate threat to security existed. The officers who "discovered" the fluid clearly did not think it represented an immediate threat to the facility; they went home for the night without notifying anyone remaining at Green Haven. If Lieutenant Napolitano was in fact notified, he too saw no immediate threat. By the time Keenan ordered Morrison's confinement the next morning, it is hard to see how an immediate threat existed when none had existed the night before. Furthermore, Keenan knew Morrison well, and regarded him as nonthreatening. Even if he believed that Morrison was guilty, he had little if any reason to believe that an escape attempt was imminent, since the vial was intercepted before it reached Morrison.

2. *Morrison's Procedural Rights.*

■ Even assuming that there was an adequate substantive predicate under New York law for segregating Morrison, he was still denied the procedural protections to which he was entitled. *Hewitt v. Helms* considered the minimally adequate level of process due before a state can deprive a prisoner of his state-created liberty interest. It concluded that "an informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him." 459 U.S. at 476, 103 S.Ct. at 874. The inmate's protections are minimal, but nonetheless permit him to know why he is being segregated and to respond to the charge: "An inmate must merely receive some no-

tice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.*

A prisoner's constitutional right of access to the courts should be accorded substantially more protection than his legally de minimis interest in remaining in the general prison population. *Hewitt v. Helms*'s minimal due process requirements may therefore provide sufficient protection of the federal interest at stake here. But even if Morrison's federal liberty interest is not entitled to greater protection than his state liberty interest, he has proved that he was deprived of the minimal due process *Hewitt v. Helms* requires even for the deprivation of state-created interests. He received no notice at Green Haven (or at Clinton) of the charge of attempting to smuggle contraband into the prison. Nor did he ever receive "an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." He has in fact never been given an opportunity to present his views on the charge to *any* official. Had he been interviewed by Keenan, he might well have convinced Keenan that something venal had been done to get him into trouble. But Keenan was not interested in holding such an interview. Furthermore, Morrison has established that he was not confined for the purpose of allowing an investigation into his conduct; no investigation occurred beyond the collection of statements on the day after the fluid was discovered.

More fundamentally, Morrison has established that he was denied due process because his confinement was based on findings or suspicions created by false reports made by prison officials. However minimal may be the process due to prisoners before segregation, that process is insufficient when it has been contaminated by the introduction through state action of false inculpatory evidence. The introduction of false evidence in itself violates the due process clause. In *Mooney v. Holo-*

*han*, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), the Court explained the violation in these terms: the use of "[s]uch a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *See Brady v. Maryland*, 373 U.S. 83, 86–88, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *Leyva v. Superintendent, Green Haven Correctional Facility*, 428 F.Supp. 1, 2 n. 1 (E.D.N.Y.1977). The fact that prisoners are not entitled to the full panoply of procedural protections afforded at trial when they are subject to internal prison discipline does not deprive them of the fundamental right not to have state officials make purposefully false statements about them. "The way a society treats those who have transgressed against it is evidence of the essential character of that society," *Hudson v. Palmer*, —— U.S. ——, ——, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984), and it is "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), that even prisoners not be deprived of the limited liberty guaranteed to them through conduct of the sort that affected Morrison. The officers who planted the vial and then reported the evidence to prison officials are therefore liable under § 1983 for depriving Morrison of his liberty without due process of law.

Morrison is also entitled to damages under § 1983 against defendants Keenan and Sullivan because of the length of time he was confined in SHU and keeplock without a hearing. Even if Morrison's initial confinement in SHU without a prior hearing had been justifiable (and, given the total fabrication of the evidence involved, it was not), he still was deprived of a protected state-created liberty interest because of the length of his confinement without a hearing.

New York has an explicit requirement that all prisoners confined to

SHU pending investigation of charges, as Morrison was, be accorded an Adjustment Committee hearing within three days of their confinement, and a Superintendent's Proceeding within seven days, absent exigent circumstances. *Powell v. Ward*, 542 F.2d 101, 102–04 (2d Cir.1976); *see Johnson v. Smith*, 83 A.D.2d 721, 722, 442 N.Y.S.2d 648, 650 (3d Dep't 1981) (referring to Department of Correctional Services rule). At that hearing, the inmate is entitled to advance written notice of the charges against him, to the right to call witnesses and present evidence in his defense unless doing so would create a serious hazard to institutional safety or correctional goals, and to a statement after the hearing of the reasons for the action taken and the evidence relied upon by the Committee. *McCann v. Coughlin*, 698 F.2d 112, 121–22 (2d Cir.1983); *see Wolff v. McDonnell*, 418 U.S. at 563–67, 94 S.Ct. at 2978–80. Morrison testified convincingly that he had been accorded none of these protections and that he had been held in SHU for at least nine days without any hearing and had been kept in keeplock for roughly an additional two weeks. The deputy superintendents in charge of security at Green Haven and Clinton, defendants Keenan and Sullivan, are responsible for the deprivation of Morrison's liberty without due process. Proof of their individual involvement is unnecessary on this aspect of Morrison's claims; their liability may rest on the failure of their departments to provide the proper hearing.

The Second Circuit's recent decision in *Sher v. Coughlin*, 739 F.2d 77, (1984), does not affect this conclusion. That case dealt only with "nonpunitive" confinement of inmates, at 81, and recognized that "[w]hen restrictive confinement within a prison is expressly imposed as a disciplinary sanction, for example, as a punishment ordered by an Adjustment Committee or a Superintendent's Proceeding ... after a finding of misconduct, there will ordinarily be no doubt that the confinement impaired a liberty interest protected by state law and that the due process procedures specified in *Wolff* are therefore required." *Id.* at 81.

Although Morrison's confinement here was not pursuant to a determination by an Adjustment Committee or Superintendent's Proceeding, it was expressly ordered in contemplation of such disciplinary actions. Thus, unlike the confinement in *Sher*, which was facially "administrative" and "nonpunitive," the confinement to which Morrison was subjected was both facially and factually connected to the punishment process. No reason other than the discovery of contraband was ever put forward for the alteration of Morrison's status. Because security reasons motivated Morrison's confinement, and because the security officers were required to provide the proper hearing, the Deputy Superintendents for Security, Keenan and Sullivan, are liable for his confinement. *See Williams v. Ward*, No. 77 Civ. 3017, slip op. at 5 (S.D.N.Y. Feb. 8, 1982), *aff'd*, 718 F.2d 1087 (2d Cir.1983).

The final question is whether Morrison's transfer from Green Haven to Clinton violated his right to due process and, if it did, who is liable for that violation. The law in New York is clear:

> [N]either the Fourteenth Amendment independently nor New York law accords an inmate a liberty interest in remaining at a particular prison facility. *Montayne v. Haymes*, 427 U.S. 236 [96 S.Ct. 2543, 49 L.Ed.2d 466] (1976). The Supreme Court made clear in *Haymes* that a transfer between New York prisons does not deny a liberty interest no matter what 'part an inmate's behavior may play in a decision to transfer.' *Id.* at 243 [96 S.Ct. at 2547].

*Sher*, at 80. And the Second Circuit in *Sher* refused to scrutinize the plaintiff's claim that he had been transferred for disciplinary reasons rather than administrative purposes, because he could have been transferred for either reason or for no reason at all without implicating any due process concerns.

*Sher*, and the line of Supreme Court decisions stretching from *Montayne* through *Olim v. Wakinekona*, 461 U.S. 238, 103

S.Ct. 1741, 75 L.Ed.2d 813 (1983), do not, however, control this case. In the remand of *Haymes* itself, 547 F.2d 188 (2d Cir. 1976), *cert. denied*, 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977), the Court of Appeals ordered that Haymes be accorded the opportunity to prove that his transfer had been ordered in retaliation for protected First Amendment activity. *Id.* at 191–92. This position—that a transfer made in retaliation for a prisoner's litigation or religious activities is invalid even though no "general 'liberty' right" exists not to be transferred, *Hohman v. Hogan*, 597 F.2d 490, 493 (2d Cir.1979) (Vermont case)—has been repeatedly reaffirmed. *See, e.g., Hasan Jamal Abdul Majid v. Henderson*, 533 F.Supp. 1257, 1270 (N.D.N.Y.) *aff'd*, 714 F.2d 115 (2d Cir.1982); *Martinez v. Oswald*, 425 F.Supp. 112, 115 (W.D.N.Y.1977), *cf. Perry v. Sinderman*, 408 U.S. at 597, 92 S.Ct. at 2697. It was not questioned in *Sher*.

Defendants Flecha, Daverso, and Panarello appear to have intended to punish Morrison for his behavior, specifically his protected litigation and prison reform activities. Morrison's transfer was a foreseeable consequence of their false accusations of plotting to escape. Because their accusations were made in retaliation for Morrison's exercise of his First Amendment rights, and because their accusations were the but-for cause of his transfer, Morrison's transfer is properly understood as retaliatory, and it therefore is not exempt from due process constraints. His transfer was a consequence of the attempted deprivation of his substantive constitutional rights and is thus actionable under § 1983, at least with respect to those officers responsible for causing it. On the other hand, Deputy Superintendent Gard ordered Morrison's transfer solely because of the alleged escape plot. No evidence was presented that would suggest that Gard desired to punish Morrison by transferring him; in fact, Gard seemed favorably disposed to Morrison.

Whether Keenan should be held liable for the transfer is more problematic.

A supervisor may be held liable under § 1983 when he "exhibited deliberate indifference" to the risk of causing some harm and his indifference "was a proximate cause of plaintiff's deprivation of rights under the Constitution." *Doe v. New York City Department of Social Services*, 649 F.2d 134, 145 (2d Cir.1981), *cert. denied*, —— U.S. ——, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). In light of his frequent contact with Morrison, Keenan was aware of Morrison's character and the implausibili of his attempting an escape, particularly in the manner suggested by the discovery of the vial. Had Keenan not been annoyed with Morrison's persistent agitation, he would not have acted as hastily as he did. Keenan appears to be a dedicated and professional prison administrator. Normally, he would have investigated a case such as this more thoroughly before concluding that a transfer was needed. His indifference to Morrison's possible innocence, even after Morrison's denial of the charges to Seitz, reflected his decision to allow the reports to become an excuse to rid himself of a troublesome inmate. But because those troubles stemmed from Morrison's First Amendment activities, specifically his victory in *Douglas v. Ward*, Keenan's decision to arrange Morrison's transfer reflected a deliberate indifference on his part that led him, indirectly but nonetheless effectively, to deprive Morrison of his substantive due process right of free access to the courts.

## B. *Madeleine Morrison's Due Process Claims.*

Madeleine Morrison traces a series of injuries to the "planting" of the fluorescent liquid. As a result of Deputy Superintendent Keenan's complaint to the State Police, she was arrested in a gratuitously cruel manner, prosecuted for a crime she did not commit, and forced to bear approximately $1200 in out-of-pocket expenses for legal fees, lost wages, and transportation. The evidence presented at trial convincingly proved the malicious intent of defendants Flecha, Panarello, and Daverso in "planting" the vial. They should have foreseen

that their reports to Keenan alleging that they had discovered escape contraband in a package brought to the prison by Mrs. Morrison would subject her to arrest and trial. The action of these four defendants caused Mrs. Morrison's injuries. Similarly, the evidence at trial showed that defendant Keenan displayed deliberate indifference to the truth or falsity of the charges against Mrs. Morrison. By contacting the State Police, he intended to cause her arrest and prosecution.

The evidence against defendants Gard and Sullivan is less conclusive. Gard, too, displayed an unfortunate degree of indifference to Mrs. Morrison's rights when he neglected to report the letter he received from her. Had that letter been communicated to the police, they might well have investigated further before deciding to arrest her; at the very least, it might have obviated the need for her to be arrested in such a traumatic manner. Defendant Sullivan is similarly implicated. In light of their actual distance from the triggering events, however, it would stretch the evidence to term them causes in fact of Mrs. Morrison's injuries.

The question thus becomes whether the four defendants referred to—Flecha, Daverso, Panarello, and Keenan—are liable under any legal theory for the injuries they caused Mrs. Morrison. The applicable legal standards suggest that although Mrs. Morrison cannot recover for either malicious prosecution or false arrest under New York law, she is entitled to recover under § 1983 for the violation of her substantive right to due process.

■ One of the essential predicates of a claim of malicious prosecution under New York law is "the termination of the proceeding in favor of the accused ..." *Broughton v. State*, 37 N.Y.2d 451, 457, 335 N.E.2d 310, 314, 373 N.Y.S.2d 87, 94, *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). An adjournment in contemplation of dismissal pursuant to N.Y.Crim.Proc.Law § 170.55 (McKinney 1982)—the ultimate disposition of Mrs. Morrison's case—is not, however, such a

termination. *Singleton v. City of New York*, 632 F.2d 185, 193–95 (2d Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981); *Hollender v. Trump Village Cooperative, Inc.*, 58 N.Y.2d 420, 425–26, 448 N.E.2d 432, 434–35, 461 N.Y.S.2d 765, 768 (1983). The state court's issuance of a certificate of termination "in favor of" the accused does not overcome this barrier. The certificate on its face reflects that its issuance was obtained on the basis of an adjournment in contemplation of dismissal. *See* Plaintiffs' Exh. 12. Thus, although this court is wholly convinced of her innocence and of the maliciousness of her prosecution, she is not entitled to recover on a claim of malicious prosecution under New York law.

■ Nor can Mrs. Morrison recover on a claim of false arrest. Under New York law, "[w]hen an unlawful arrest has been effected by a warrant an appropriate form of action is malicious prosecution." *Broughton*, 37 N.Y.2d at 457–58, 335 N.E.2d at 314, 373 N.Y.S.2d at 94. Thus, because she was arrested pursuant to a valid warrant, the appropriate state-law form for her action is a suit for malicious prosecution, which, as we have already seen, is barred. Given a properly issued arrest warrant, a "valid arrest will not be rendered unlawful by malicious motives," *id.* at 459, 335 N.E.2d at 315, 373 N.Y.S.2d at 95. Thus, she is not entitled to recovery for the manner in which her arrest was made.

■ The question remains, however, whether these barriers also prevent Mrs. Morrison from obtaining relief under § 1983. In light of the fundamental distortion of the judicial process involved in this case, relief should be afforded under § 1983.

*Singleton v. City of New York*, the leading case in this Circuit on "whether a § 1983 claim for deprivation of civil rights through malicious prosecution may be stated without alleging and proving that the prosecution terminated in some manner indicating that the person was not guilty of

the offense charged," suggests that relief is barred. 632 F.2d at 194–95. But the *Singleton* court implicitly recognized that this general rule was not an absolute barrier when it stated that a § 1983 complaint did not allege a wrong to the plaintiff when it sought "federal review of a state prosecution on grounds of unfairness, absent proof of denial of due process *or* a finding that the defendant was maliciously prosecuted upon a charge of which he was found not guilty." *Id.* at 195 (emphasis added). Either form of unfairness, therefore, can support a § 1983 action. A recent § 1983 case brought in New York state court expanded upon this distinction. *Bradshaw v. Silversmith*, 122 Misc.2d 544, 472 N.Y.S.2d 237 (Spec.Term 1983), held that, although the plaintiff's claim for malicious prosecution for harboring a dog without a license was barred because she had pled guilty (decidedly not a favorable termination of the action), she still could state a claim cognizable under § 1983. The court distinguished *Singleton* in this way:

> *Singleton v. City of New York* is cited by defendant in support of the proposition that a § 1983 action based on an allegedly improper criminal proceeding could not stand if the underlying criminal prosecution failed to terminate favorably to plaintiff. But the fact that a plaintiff may have pleaded guilty to a minor charge for the sake of expediency should not preclude her from showing that the entire process was unfair and resulted in an essential denial of due process.

*Id.* at 551, 472 N.Y.S.2d at 242 (citation omitted). That same distinction applies to the treatment of Mrs. Morrison. The proceedings against her cannot be sanitized merely because she accepted the prosecution's offer to adjourn her case under § 170.55.

For Madeleine Morrison, like her husband, the entire process was unfair and resulted in an essential denial of due process. She had a cognizable constitutional interest in fundamentally fair state proceedings and the use of evidence deliberately falsified by state officials deprived her of that right.

 In deciding whether due process concerns are implicated by a particular state act, a court must consider whether that act " 'offend[s] those canons of decency and fairness which express the notions of justice of English speaking peoples'.... [and is] 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Rochin v. California*, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952) (citations omitted). It is "implicit in the concept of ordered liberty" exemplified by the Fourteenth Amendment, *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), that the processes by which a person is deprived of her liberty not be tainted by the intentional and malicious acts of state officials. *Cf. Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (criminal liability for persons acting under color of state law who wilfully deprive someone of constitutional rights).

 Courts have repeatedly recognized that a conviction obtained through the knowing use of false evidence is fundamentally unfair and violative of due process. *E.g., Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *Leyva v. Superintendent, Green Haven Correctional Facility*, 428 F.Supp. 1, 2 n. 1 (E.D.N.Y.1977). This same principle should apply to the purposeful creation and use of false evidence engaged in by defendants Flecha, Daverso, and Panarello. The natural and foreseeable consequence of their "discovering" and reporting the vial of fluorescent liquid was that Mrs. Morrison, the person who had brought the recharger to Green Haven, would be suspected of, and possibly arrested and tried for, introducing contraband into the prison. They should not be protected from liability for their act because Mrs. Morrison was fortunately not convicted on the basis of the evidence they supplied. Neither Gard nor Keenan, however, can properly be held liable to Mrs. Morrison. Gard's involvement was tangential and distant. While Keenan displayed indifference by reporting

Mrs. Morrison's alleged participation in the escape plot to the State Police without making a significant effort to investigate the truth of the officers' charges, it was not "that reckless indifference to the rights of others which is equivalent to an intentional violation of them." *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 1633, 75 L.Ed.2d 632 (1983) (quoting *Milwaukee & St. Paul Ry. Co. v. Arms,* 91 U.S. (1 Otto) 489, 493, 23 L.Ed. 374 (1875)).

Although defendants are therefore liable for damages arising from Mrs. Morrison's arrest and trial, they cannot be held liable for the gratuitously cruel way in which she was arrested, since plaintiffs did not prove that defendants knew or should have foreseen that Mrs. Morrison would be lured to Clinton with the promise of visiting her husband and then taken from the visiting room. This does not mean, of course, that the episode did not violate Mrs. Morrison's right to due process. Although most of the cases which find constitutional violations in "conduct that shocks the conscience," *Rochin,* 342 U.S. at 172, 72 S.Ct. at 209, involved acts of physical brutality, the Supreme Court has often noted in the analogous context of interrogation that psychological tactics can be "equally destructive of human dignity," *Miranda v. Arizona,* 384 U.S. 436, 457, 86 S.Ct. 1602, 1619, 16 L.Ed.2d 694 (1966); *see Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960) ("the blood of the accused is not the only hallmark of an unconstitutional inquisition"). Mrs. Morrison is barred from recovering for her emotional distress not because her injury is not cognizable under § 1983, but because her proof does not identify the individuals responsible for the sadistic manner of her arrest.

### C. *Thomas Morrison's Treatment in Confinement.*

Thomas Morrison's claims concerning his treatment while in the SHU at Clinton fail to establish that he was subjected to punishment that was cruel and unusual. The staff's refusal to close the window near his cell despite his repeated requests may have evidenced some indifference to Morrison's comfort, particularly in light of his hypertension. But this neglect cannot reasonably be described as "the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (Stewart, Powell & Stevens, JJ.)). Exposing a prisoner to unpleasantly cold but not dangerous temperatures is not sufficiently "repugnant to the conscience of mankind" to violate the Constitution. *Estelle v. Gamble,* 429 U.S. at 105, 97 S.Ct. at 292; *cf. Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 470–72, 67 S.Ct. 374, 379–81, 91 L.Ed. 422 (1947) (Frankfurter, J., concurring) (approving second attempt to electrocute prisoner as "not repugnant to the conscience of mankind").

Morrison's claims concerning deprivation of his hypertension medication similarly fail to show a violation of the Eighth Amendment. Not every act of possible malpractice rises to constitutional dimensions. The testimony presented at trial did not show convincingly that Morrison was denied essential medication or that any injury followed the denial. All that was shown was that he asked for medication which he did not receive. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292. Even actual malpractice may not create liability under § 1983. Morrison failed to prove either deliberate indifference or serious medical needs; he is therefore not entitled to relief.

### D. *The Morrisons' Mail and Visitation Rights.*

The Morrisons also claim that the mail watch imposed on Mr. Morrison's mail during his stay at Clinton and the revoca-

tion of Mrs. Morrison's visiting privileges during the pendency of the criminal action against her violated the First and Eighth Amendments, respectively. These claims must be rejected.

Deputy Superintendent Gard's affidavit states that a mail watch had been ordered because Morrison was considered an escape risk. No persuasive evidence was offered to suggest that this watch went beyond the bounds established by *Wolff v. McDonnell,* 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974): "[F]reedom from censorship is not equivalent to freedom from inspection or perusal." A delay of approximately one week cannot trigger constitutional protections. Moreover, some inspection of Morrison's mail would have been permissible even if he had not been suspected of plotting to escape. No suggestion of any censorship or content-based restrictions was offered; the suggestion that some attorney-client mail was not delivered was not proved.

As to the denial of visiting privileges, Mrs. Morrison cannot claim any violation of her rights under the Eighth Amendment, since whatever the injury it worked on her, the Eighth Amendment is inapplicable. *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), established the boundaries of Eighth Amendment protection. There, the Court explained that "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Id.* at 671 n. 40, 97 S.Ct. at 1413 n. 40. Because the sanction was imposed on Mrs. Morrison without any formal adjudication of her guilt, indeed, despite the fact that she was innocent of the charge against her, her remedies lie in the Fourteenth Amendment's guarantee of due process.

Similarly, although Mr. Morrison possessed a state-created liberty interest in

visits by his family, *Kozlowski v. Coughlin,* 539 F.Supp. 852, 856–57 (S.D.N.Y. 1982), the deprivation of that liberty interest does not constitute cruel and unusual punishment. "[T]he promulgation of visiting regulations is a matter properly left to the competence and discretion of prison officials." *Louis v. Ward,* 444 F.Supp. 1107, 1109 (S.D.N.Y.1978); *see McCray v. Sullivan,* 509 F.2d 1332, 1334 (5th Cir.) (same), *cert. denied,* 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975); *cf. Block v. Rutherford,* — U.S. —, —, 104 S.Ct. 3227, 3232–35, 82 L.Ed.2d 438 (1984) (pretrial detainees). It is reasonable for a prison to deny visiting privileges to someone who is suspected of having attempted to aid a prisoner's escape. *See* Plaintiffs' Exh. 46 (items III.A.5. & III.B.1.); *People ex rel. Jacobson v. Warden,* 77 A.D.2d 937, 937, 431 N.Y.S.2d 114, 115 (2d Dep't 1980). The unreasonableness and the unconstitutionality of the deprivation in the instant case stems not from any cruel or unusual treatment in forbidding visits by a person accused of aiding inmate escapes. Rather, it stems from the effect upon otherwise proper prison decisionmaking caused by the planted evidence. Thus, these deprivations should be viewed as part of the consequences of depriving the Morrisons of the constitutionally significant liberty interests discussed above.

E. *Thomas Morrison's Property Claims.*

 Thomas Morrison claims that when he was transferred from Green Haven to Clinton, he was forced to leave behind jewelry, musical equipment, legal papers, and other personal property, worth a total of slightly over $3000. He was unable to recover this property after his arrival at Clinton. He argues that the state violated his right to due process when it deprived him of his property. He relies on Judge Werker's decision in *Williams v. Ward,* No. 77 Civ. 3017, slip op. at 6 (S.D.N.Y. Feb. 8, 1982), *aff'd,* 718 F.2d 1087 (2d Cir. 1983), to distinguish his claim from those rejected in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), arguing that he is entitled to damages of $3130

not for deprivation of the property itself but as damages incidental to an illegimate transfer.

This distinction, though a characteristically sound and practical idea as used by Judge Werker, is unpersuasive in this case. The causal relationship between Morrison's transfer and his final loss of his property is too tenuous to make the loss of the property a result of the transfer. After Morrison arrived at Clinton, he filed requests to have his property sent to him. Had the Department been satisfied with Morrison's requests, they presumably would have sent the items to him at Clinton or to his wife (if a local permit could not be obtained). Thus, it was not the transfer itself which caused the final deprivation; it was the operation of the Department of Correction's claims process.

*Parratt* therefore governs this case. The question therefore is whether the deprivation of Morrison's property, which was undoubtedly caused by prison officials acting under color of state law, was done without due process. Plaintiff has failed to prove this element of a § 1983 claim.

In *Parratt*, a Nebraska prison inmate claimed he had been deprived of property without due process when prison officials negligently lost his hobby kit. The Supreme Court held that, when a plaintiff's deprivation was caused by the unauthorized or random acts of state employees, the procedural requirements of the Fourteenth Amendment could be satisfied by post-deprivation state-law remedies. 451 U.S. at 541–44, 101 S.Ct. at 1916–17. If the state provides such remedies (even if those remedies do not provide all the relief obtainable under § 1983, 451 U.S. at 544, 101 S.Ct. at 1917), a plaintiff is not deprived of his property without due process of law. A deprivation for constitutional purposes only occurs when the state not only takes the property but fails to provide the owner with any procedure for redress. *See Haygood v. Younger*, 718 F.2d 1472, 1480–81 (9th Cir.1983); *Barnier v. Szentmiklosi*, 565 F.Supp. 869, 875 (E.D.Mich.1983). The Supreme Court's recent decision in *Hudson*

*v. Palmer*, —— U.S. ——, ——, 104 S.Ct. 3194, 3201–04, 82 L.Ed.2d 393 (1984), extended *Parratt* to random intentional deprivations as well.

In this case, plaintiff has not shown that established state procedures were inadequate to protect his property interest. In fact, Morrison seems to have filed an administrative request, an Article 78 proceeding, and a suit in the state Court of Claims. Had he not abandoned these actions, he might well have recovered his possessions. His choice not to pursue these avenues says nothing about their potential ability to provide him with redress for the allegedly wrongful deprivation. The converse is true. New York law appears to provide ample opportunities for post-deprivation relief.

Nor does plaintiff's claim fall under the exception to *Parratt* carved out by *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). There, the Court held that, when some established procedure causes the deprivation, a plaintiff may be entitled to relief under § 1983. Here, it was not the normal operation of the prison system or its claims process, but the acts of individual officials, that caused whatever losses occurred. Even if plaintiff's claims are now time-barred in state court, the system promised him adequate opportunity to obtain relief.

Despite this conclusion, there remains the question whether this court can or should read Morrison's claim for damages for wrongful deprivation of his property as a pendent state-law claim. *Parratt* provides no guidance to answer this question. There, the only claim advanced by the plaintiff Taylor was for the deprivation of his hobby kit. That claim involved, as the Supreme Court concluded, only questions of state law. No federal claim was therefore presented in *Parratt* to which Taylor's property claim could be deemed pendent. In this case, by contrast, the Morrisons have valid § 1983 claims based on deprivations of their liberty.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)

describes the nature of pendent jurisdiction:

> Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority...." U.S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. *Levering & Garrigues Co. v. Morrin*, 289 U.S. 103 [53 S.Ct. 549, 77 L.Ed. 1062]. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

*Id.* at 725, 86 S.Ct. at 1138 (emphasis in original); *see Smith v. Jordan*, 527 F.Supp. 167, 173 (S.D.Ohio 1981) (*Gibbs* standard applies to § 1983 cases).

Morrison's claim satisfies the *Gibbs* test. The federal constitutional claims involved in this case were more than colorable; in fact, plaintiffs have prevailed on several of them. Thus, Morrison more than meets the "substantiality" threshold. *Cf. Rosado v. Wyman*, 397 U.S. 397, 404–05, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970) (court need not have jurisdiction over primary claim at all stages of litigation to exercise pendent jurisdiction). Moreover, Morrison's claim also satisfies the "common nucleus" criterion. Both his transfer and segregation and his loss of property stemmed from the episode involving the battery recharger brought to Green Haven. Although the property loss was not caused by the transfer in the "constitutional" sense, that is, in a way which would make *Parratt* irrelevant, there was a causal connection between the transfer and the loss,

since but for the move to Clinton Morrison might have retained his property, either within the prison or by having the forbidden items sent to his wife.

The Supreme Court's recent decision in *Pennhurst State School & Hospital v. Halderman*, —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), does not affect this conclusion. *Pennhurst* holds that when the Eleventh Amendment bars federal causes of action which could otherwise be brought in federal court, it bars pendent claims as well. The Court made two findings in *Pennhurst* that are germane to this case. First, it found that the federal claims in fact involved "a suit against the State itself." *Id.* at 908; *see id.* at 909–17. Thus, they were barred by the Eleventh Amendment. Second, it held that "the explicit limitation on federal jurisdiction contained in the Eleventh Amendment" overrode the "judge-made doctrine [of pendent jurisdiction] inferred from the general language of Art. III." *Id.* at 917; *see id.* at 917–19.

The instant case, however, does not involve claims barred by the Eleventh Amendment. The real party in interest here is not the State of New York, but a group of prison officials who acted against both state and federal law and outside their authority. *See Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 462–64, 65 S.Ct. 347, 349–51, 89 L.Ed. 389 (1945). Thus, no explicit constitutional provision overrides this court's power to exercise pendent jurisdiction.

Pendent jurisdiction, however, "has consistently been recognized ... [to be] a doctrine of discretion, not of plaintiff's right." *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. If exercising pendent jurisdiction would not serve "judicial economy" or "convenience" a federal court "should hesitate to exercise jurisdiction...." *Id.* In this case, several considerations militate against deciding Morrison's state law property claims. First, the applicable state law is unclear. Since neither party viewed Morrison's claim as anything other than a

straightforward § 1983 claim, neither side briefed the applicable New York standard for deciding when confiscation of a prisoner's property deprives him of state-created property interests. *See Smith v. Weinstein*, 578 F.Supp. 1297, 1305–06 (S.D.N.Y.) (declining pendent jurisdiction given "uncertain nature of state-law issues"), *aff'd*, 738 F.2d 419 (2d Cir.1984). Second, it is unclear whether any sort of exhaustion requirement applies to property claims by prisoners. It may well be that, by failing to follow through on his claim with the Department of Corrections, Morrison failed to exhaust available administrative remedies and is therefore not entitled to sue under New York law. In addition, neither side presented legal arguments on the issue of state liability in the abandoned Court of Claims proceeding. *Pennhurst* makes clear that if the state is the real party in interest in that action, then the Eleventh Amendment would bar this court from exercising pendent jurisdiction. Finally, many unresolved factual questions remain regarding Morrison's property claim, the resolution of which would require scarce federal judicial resources. The actual ownership of some items is in question, for example, as is what exactly happened after Morrison responded to the state's offer to forward some of the property. Because the defendants apparently viewed Morrison's property claim as sounding solely in federal law, a basis on which Morrison was barred from recovery by *Parratt*, they may not have taken the opportunity to brief these points fully. To reopen the case at this point to decide these questions would go against the spirit of pendent jurisdiction expressed in *Gibbs; see Smith v. Weinstein*, 578 F.Supp. at 1306. Thus, although there may be cases in which exercising federal jurisdiction over state property law claims that do not rise to constitutional dimensions may serve the interests of both justice and judicial administration, this is not one of them. Morrison's state law property claims are therefore dismissed for him to bring, if he can, in state court.

## CONCLUSION

In light of the above findings of fact and conclusions of law, the court awards Thomas Morrison $50,000 in compensatory damages. Defendants Flecha, Daverso, and Panarello are jointly and severally liable for all $50,000 of that sum; defendants Sullivan and Keenan are jointly and severally liable for only $10,000 of that sum, in light of their lesser involvement. Madeleine Morrison is awarded $25,000 in compensatory damages, for which defendants Flecha, Daverso, and Panarello are jointly and severally liable. In addition, Thomas and Madeleine Morrison are together entitled to $5000 in punitive damages from defendants Flecha, Daverso, and Panarello each. The court is aware that these defendants are not wealthy men and has adjusted its punitive damage awards accordingly. The parties will attempt to agree on an appropriate attorney's fee, failing which a motion to set the fee should be made within ten days of this opinion.

This case illustrates that, regardless of the practical and jurisprudential justifications for limiting the recent flood of largely meritless *pro se* prisoner petitions, the federal courts must remain open to vindicate claims such as the one brought by the Morrisons in this action. If the promise of due process is to remain real, the federal courts must ensure that prison officials will not be permitted to oppress their wards with fraudulent charges, particularly as a form of official revenge for protected activities.

SO ORDERED.