**Bryon WARING a/k/a Shahin S.B. Rashad, et al.,**

v.

**Larry MEACHUM, et al.**

**Civ. No. 3:93 CV 1590(PCD).**

United States District Court, D. Connecticut.

Aug. 24, 2001.

Donna J. Burpee, Hartford, CT, Bryon Waring, Somers, CT, William Emmett Dwyer, West Cornwall, CT, Norman A. Pattis, New Haven, CT, for plaintiffs.

Steven R. Strom, Hartford, CT, Leslie D. McCallum, Hartford, CT, Ronald Edward Naves, Jr., Hartford, CT, Lynn D. Wittenbrink, Hartford, CT, for defendants.

### RECOMMENDED RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

FITZSIMMONS, United States Magistrate Judge.

This is a consolidated class action, brought pursuant to 42 U.S.C. § 1983, by inmates incarcerated in E and F Blocks at the Connecticut Correctional Institution at Somers during a lockdown which occurred

from March 18 to March 25, 1993.[1] The defendants are mostly former correctional administrators and officers.[2] Plaintiffs contend that, during the course of the lockdown, their constitutional rights under the First, Fifth, Eighth and Fourteenth Amendments were violated by defendants, who were acting under color of state law. Pending before the court is defendants' motion for summary judgment on grounds that plaintiffs' claims fail to rise to the level of an Eighth Amendment violation and, in the alternative, are barred under the doctrine of qualified immunity. [Doc. # 169.] For the reasons discussed below, defendants' motion is **GRANTED**. [Doc. # 169.]

*BACKGROUND*

A. *Factual Background* [3]

1. During March 18–25, 1993, plaintiffs were prisoners confined to Cell Blocks E and F at the Connecticut Correctional Institution at Somers (hereafter "Somers"). [Amended Compl., Doc. # 92, ¶ 6].

2. On March 18, 1993, Warden Robert Kupec ordered that Somers be placed on lockdown status after a series of assaults against Department of Correction ("DOC") staff and other prisoners. [Doc. # 170, Phillips Affidavit; Doc. # 172, ¶ 16.]

3. The assaults leading up to the imposition of lockdown status included inmate stabbings on March 4, March 5, March 7, and March 17, 1993, as well as assaults against DOC staff on March 11, March 15, March 17, and March 18, 1993. [Doc. # 172, ¶¶ 4–15; Doc. # 173], Exhibit 14, March 1993 Monthly Report.[4]

4. The inmate on inmate assaults all involved stabbings with homemade shanks

---

1. The following cases have been consolidated for purposes of determining liability: *Waring a/k/a Rashad v. Meachum, et al.*, No. 3:93CV–1590 (PCD) (filed Aug. 10, 1993); *Hie v. Meachum, et al.*, No. 3:93CV–2084 (AHN); *Hie v. Meachum, et al.*, No. 3:93CV–2085 (AHN); *Branham v. Meachum, et al.*, No. 3:93CV–1369 (PCD) (filed July 12, 1993); *Branham v. Meachum, et al.*, No. 3:93CV–1437 (PCD) (filed July 20, 1993); *Gilchrist v. Meachum, et al.*, No. 3:93CV–2348 (PCD) (filed Nov. 23, 1993); *Thompson v. Meachum, et al.*, No. 3:93CV–1825 (AHN) (filed Sept. 10, 1993); *Brannen v. Meachum, et al.*, No. 3:93CV–1821 (PCD) (filed Sept. 7, 1993); *Bewry v. Meachum, et al.*, No. 3:93CV–2031 (PCD) (filed Oct. 8, 1993); *Skeeter v. Meachum, et al.*, No. 3:93CV–1722 (AHN) (filed July 12, 1993); *Roberts v. Meachum, et al.*, No. 3:93CV–1993 (PCD) (filed Aug. 16, 1993); *Din v. Kupec, et al.*, No. 3:93CV–1614 (AHN) (filed July 9, 1993).

2. Named defendants are Larry Meachum, Commissioner, Connecticut Department of Correction; Warden Robert Kupec; John Armstrong, Regional Director; Jack Tokarz, Deputy Warden; Guy Oakes, Deputy Warden; Major William Grey; Captain Michael F. Gallagher; Captain Bargainer; Captain Derek Davis; Captain Joyce McKinney; Lieutenant Carthon; Lieutenant Sandra R. Gawron;

Lieutenant Walter L. Champion; Lieutenant Winston McGregor; and Correctional Officers L.L. Smith, Murry, Lajoy Dumas, Lajoie, Aliengena, S. Looke, M. Peluso, P. Murphy, George Circosta, P. Wilcox, Renard, M. Glenn, Renault and K–9 Officers Shandra, J. Serrazina, and Madden.

3. The factual background is taken from the Local Rule 9(c) statements, with attached exhibits submitted by the parties. Generally, the court would not consider plaintiffs' Exhibits 3, 9, or 10 for failure to comply with 28 U.S.C. § 1746, which requires all affidavits to be sworn to under penalty of perjury. *See also Yearwood v. LoPiccolo*, 1998 WL 474073, at *5 (S.D.N.Y. Aug.10, 1998); *Hameed v. Pundt*, 964 F.Supp. 836, 840–41 (S.D.N.Y. 1997). However, in the interests of justice the court will accept these affidavits and to the extent the complaints raised in them are different than those in the properly sworn affidavits, the court addresses them below.

4. The monthly report is prepared by Kupec and summarizes attacks by inmates against other inmates or against staff. The report also details projects undertaken at the facility and problems which require attention. [Doc. # 173, Exhibit 14.]

or other weapons. [Doc. # 172, ¶¶ 4, 5, 6, 11; Doc. # 173, Exhibit 14.]

5. DOC staff member assaults involved inmates kicking or hitting employees, throwing human waste on staff, and on one occasion stabbing a corrections officer with a shank. [Doc. # 172, ¶¶ 7, 8, 9, 10, 12, 13, 15; Doc. # 173, Exhibit 14.]

6. During a group disturbance on March 15, 1993, a response team recovered a five-inch stainless steel knife, a ten-inch ice-pick style shank, a seven-inch rod type shank, and three masks. A subsequent search of the cells of the inmates involved in the disturbance resulted in the discovery of a seven-inch ice-pick type shank. [Doc. # 172, ¶ 9; Doc. # 173, Exhibit 6.]

7. After an inmate was stabbed in the B Block unit on March, 17, 1993, a shakedown of the unit revealed five shanks, one of which was found outside the unit, and 20 cutter heads for barber clippers. [Doc. # 172, ¶ 11; Doc. # 173, Exhibit 8.]

8. As a result of these incidents, Somers was placed on lockdown status beginning March 18, 1993. [Doc. # 172, ¶ 16; Doc. # 173, Exhibit 14.]

9. On March 19, the Somers Correctional Emergency Response Team ("CERT") conducted a facility-wide, cell by cell inspection. The CERT inspection procedure involved removing each inmate from his cell, strip searching the inmate, and removing all inmate property from the cell. This procedure was used to effectuate a thorough search for weapons that may be concealed in the cell. [Doc. # 172, ¶ 17., Doc. # 170, ¶ 17, Affidavit of Michael Phillips.]

10. CERT members and DOC employees removed all property from each cell, except for a mattress and blanket.[5] [Doc. # 172, ¶ 23; Doc. # 173, Exhibit 29, at 86.] Inmates were permitted to retain the clothing they were wearing at the time of the search, but no additional clothing was made available. Some inmates had access to basic personal hygiene items during the term of the lockdown, while others did not. [Doc. # 175, Exhibits 1, 2, 4, 7, 8.]

11. During the course of the facility-wide search, correctional officers and CERT members recovered 88 weapons. [Doc. # 172, ¶ 18; Doc. # 173, Exhibit 14.]

12. During the lockdown there were repeated incidents of inmates flooding their toilets and starting nuisance fires on the tiers. [Doc. # 172; Doc. # 175, Exhibit 4.]

13. At all times during the lockdown, the heating at Somers was fully operational. The heat remains on at the prison until April 15th of each year, unless extreme cold weather requires the heat to remain on later. Individual staff members have no ability to turn the heat on or off, or to adjust the temperature. The system is designed to keep the air temperature within the prison in the range of 68 to 72 degrees. [Doc. # 171, Affidavit of Clifford Jenkins.]

14. The temperature in F-block during the lockdown was approximately 65 to 70 degrees. No window in F-block was broken during the lockdown. F-block windows are constructed of ¾ inch security glass and can not be broken by objects thrown by inmates. F-block windows are on the exterior walls, separated by a distance of approximately ten feet from the

5. Although circumstances differ as to the content of the cells upon return from the strip search, it appears that the plaintiffs each had, at a minimum, a blanket or sheet and a mattress, with the exception of Mr. Branham and Mr. Hie. Plaintiff Branham had only a mattress in his cell and was not provided with a sheet or blanket. Plaintiff Hie did not have either a blanket or a mattress.

cells on the interior. [Doc. # 171, Affidavit of Clifford Jenkins.]

15. The temperature in E-block during the lockdown was approximately 65 degrees, and at no time did the temperature drop below 60 degrees. The E-block temperature is generally cooler than F-block because of the heat distribution system. Inmates broke windows on E-block on March 19, 1993, as those windows were not constructed of security glass. As with F Block, the windows on E-block are on the exterior walls, separated by a distance of approximately ten feet from the cells on the interior. Broken windows were covered with plastic or cardboard as temporary repairs the same day they were broken. [Doc. # 171, Affidavit of Clifford Jenkins.]

16. Plaintiff Damon Perry stated that he thought the temperature in his cell during the lockdown was approximately 65 degrees. [Doc. # 158 at Attachment 1, 116.]

17. While the facility was on lockdown status, all meals were served to inmates in their cells. Meals during this period generally consisted of one or two donuts, milk and corn flakes or oatmeal for breakfast, and either two cheese or cold cut sandwiches and milk for lunch and dinner. [Doc. # 175, Exhibits 2, 7, 8.] There is no claim that inmates without religious dietary restrictions failed to receive any meals.

18. Inmates observing the religious holiday of Ramadan, which requires adherents to fast between sunrise and sunset, generally received at least a bagged meal before sunrise. The bag meal consisted of cold cereals, sliced bread, an occasional apple, and beverage. [Doc. # 175, Exhib-

its 1, 3, 6.] One plaintiff who was fasting stated that during the lockdown he ate either grilled cheese sandwiches and french fries, fish and potatoes, cheese casserole, or tuna casserole. [Doc. # 175, Exhibit 1.]

19. Two plaintiffs who were observing Ramadan submitted affidavits stating that they were not served meals during the lockdown. Plaintiff Rashad stated that he received meals late, causing him to go almost 24 hours without food, and on two occasions did not receive his bagged meal. [Doc. # 175, Exhibit 1.] Plaintiff Talib Din's Ramadan meal was confiscated on the first day of the lockdown, causing him to go 32 hours without food and resulting in severe hunger pains and mental anguish. [Doc. # 175, Exhibit 6.]

20. Plaintiffs made many complaints to correctional officers that they suffered from hunger pains and other manifestations of hunger because they did not receive enough food. [Doc. # 175, Exhibits 1, 4, 6, 7.]

21. Plaintiff Thompson lost seven pounds during the lockdown and suffered from headaches and constipation. [Doc. # 175, Exhibit 7.]

22. Plaintiff Bewry was escorted to the medical unit one evening because he was weak and dizzy from the lack of food.[6] [Doc. # 175, Exhibit 4.]

23. There is no evidence before the court that any plaintiff suffered a serious injury due to the composition of the meals served during the lockdown.

24. No showers were permitted during the course of the lockdown.

25. With the exception of Plaintiff Branham, there is no indication that the

---

**6.** Plaintiff Bewry observed Ramadan during the lockdown period. [Doc. # 175, Exhibit 4.]

remaining class members had less than one complete set of clothing. Branham wore a pair of long john pants and a t-shirt for the duration of the lockdown. No plaintiff had access to a change of clothing or underwear during the lockdown. [Doc. # 175, Exhibits 1, 4, 5, 7, 8.]

26. Several plaintiffs suffered from rashes due to the lack of showers or change of clothing. [Doc. # 175, Exhibits 5, 6.]

27. Medical unit employees were on duty at all times during the lockdown, and medical staff members were in the E-block and F-block units at least once each shift during this period. [Doc. # 170, Affidavit of Michael Phillips.]

28. A review of the logbooks for both units indicates that medical staff responded to numerous inmate complaints during the lockdown. [Doc. # 173, Exhibits 28, 29, A.]

29. Plaintiff Rashad had blood in his stools during the lockdown and, although he spoke with a medical staff member about that condition, he was not examined by anyone. [Doc. # 175, Exhibit 1.]

30. Plaintiff Branham requested medical treatment for a rash during this period, but was never seen by medical personnel. [Doc. # 175, Exhibit 5.]

31. Plaintiff Skeeter was not provided with medically prescribed meals for an ulcer and high cholesterol from March 19 through March 24, 1993. [Doc. # 175, Exhibit 3.]

32. Plaintiff Roberts suffered severe hunger pains and also developed a rash on his mid-section during the seven days of the lockdown. His requests for medical attention were denied. [Doc. # 175, Exhibit 9.]

33. Due to the lack of bedding, lack of clothing, winter temperatures, lack of heat, cold food, and broken windows in the cell block, plaintiffs were cold during the lockdown.

34. To date, plaintiffs have not recovered all of the property that was confiscated on March 19, 1993, during the "shakedown." [Doc. # 175.]

35. During the lockdown, inmates of E and F Blocks did not leave their cells and were deprived of recreation time.

### B. *Procedural Background*

On August 10, 1993, plaintiff Byron Waring, a/k/a Shahin Rashad, filed this action alleging various violations of his civil rights during the lockdown at Somers from March 18 to March 25, 1993.[7] [Doc. # 2.] Defendants filed a Motion for Judgment on the Pleadings on October 4, 1994 [Doc. # 57], and a Renewed Motion for Judgment on the Pleadings on February 26, 1996 [Doc. # 93]. The court granted defendants' motion as to the alleged Fourteenth Amendment violation, and the First Amendment violation by which plaintiffs' access to the courts was limited and defendants confiscated religious reading material and "interfer[ed] with the religious dietary practices of the inmates."[8] [Doc. # 99.] Plaintiffs' surviving claim was

---

**7.** The court granted plaintiffs' class certification for purposes of determining liability on September 8, 1994. [Doc. # 52.]

**8.** The recommended ruling was approved and adopted by Judge Dorsey on March 27, 1997. [Doc. # 102.] Plaintiffs' Eighth Amendment claims of cruel and unusual punishment due

to suspension of recreation, lack of bedding, clothing, warm food, and cold temperatures, and a Fifth Amendment claim due to lack of writing materials available to plaintiffs were dismissed because plaintiffs failed to file a memorandum in opposition to defendants' motion on these counts. [Doc. # 99.]

based on an Eighth Amendment violation concerning the conditions of confinement during the lockdown. [*See id.*]

Defendants filed a Motion to Dismiss on December 14, 1998. [Doc. # 135.] On June 8, 1999, the court ordered defendants to file a supplemental memorandum on the issue of qualified immunity to help it decide whether to grant summary judgment on this issue before deciding plaintiffs' motion to decertify the class. [Doc. # 142.] Plaintiffs failed to respond to this order and the court subsequently granted defendants' motion for summary judgment. [Doc. # 144.] Judge Dorsey granted plaintiffs' motion for reconsideration [Doc. # 154], and plaintiffs filed their memorandum in opposition to defendants' motion for summary judgment on November 22, 1999 [Doc. # 155].

On February 1, 2001, defendants filed a formal summary judgment motion on plaintiffs' Eighth Amendment claims. [Doc. # 169.] Plaintiffs filed their objection to the summary judgment motion on March 23, 2001 [Doc. # 175], and defendants' reply brief was filed on April 16, 2001 [Doc. # 176].

*STANDARD*

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." *Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.) After discovery, if the non-moving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). *See also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992).

In the context of a motion for summary judgment pursuant to Rule 56(c), disputed issues of fact are not material if the moving party would be entitled to judgment as a matter of law even if the disputed issues were resolved in favor of the non-moving party. Such factual disputes, however genuine, are not material, and their presence will not preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir.1992).

*DISCUSSION*

Although defendants raise the defense of qualified immunity, the court will first address their claim that the allegations in plaintiffs' complaint do not rise to the level of an Eighth Amendment violation.

A.  *Eighth Amendment Claims*

While prison officials may impose institutional lockdowns, the conditions un-

der which the inmates are confined must not violate the Eighth Amendment.[9] The Supreme Court has defined the contours of the Eighth Amendment protection against cruel and unusual punishment, made applicable to the states by the Fourteenth Amendment, as follows:

> The Eighth Amendment's ban on inflicting cruel and unusual punishments ... "proscribe[s] more than physically barbarous punishments." ... It prohibits penalties that are grossly disproportionate to the offense ... as well as those that transgress today's "'broad and idealistic concepts of dignity, civilized standards, humanity and decency.'"

*Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (citations omitted). *See also Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). There is no static test for determining whether conditions of confinement are cruel and unusual. *Rhodes,* 452 U.S. at 346, 101 S.Ct. 2392. The Eighth Amendment must "draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id.*

■ Under the Eighth Amendment, sentenced prisoners are entitled only to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds, Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Lareau v. Manson,* 651 F.2d 96, 106 (2d Cir.1981). *See also Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (Supreme Court noted that Eighth Amendment imposes certain duties on prison officials, to "ensure that inmates receive adequate food, clothing, shelter

and medical care, and must 'take reasonable measures to guarantee the safety of the inmates'") (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)); *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392 (Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). The Eighth Amendment "does not mandate comfortable prisons." *Rhodes,* 452 U.S. at 349, 101 S.Ct. 2392. "To the extent ... conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347, 101 S.Ct. 2392. Furthermore, "when a genuine emergency exists, prison officials may be more restrictive than they otherwise may be, and certain services may be suspended temporarily." *Hoptowit v. Ray,* 682 F.2d 1237, 1259 (9th Cir.1982).

■ To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege a "sufficiently serious" deprivation under an objective standard and that prison officials subjectively acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–98, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission ... result[s] in the denial of the 'minimal civilized measure of life's necessities.'" *Id.* at 298, 111 S.Ct. 2321 (citing *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392). In addition, the prison officials must have acted with deliberate indifference in that they "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Branham v. Meachum,* 77

---

9. Plaintiffs have not challenged the constitutionality of the March 18 through March 25, 1993, lockdown itself.

F.3d 626, 631 (2d Cir.1996) (quoting *Hath-away v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied sub nom. Foote v. Hathaway*, 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995)).

In this case, plaintiffs allege that the March 1993 lockdown violated the Eighth Amendment because of the "cruel, unusual, and harsh" conditions that resulted from the prison's lockdown status. [Doc. # 92.] Specifically, plaintiffs allege they were denied warm food in sufficient quantities, some prisoners were not provided their special diets, they were denied showers during the seven day lockdown, they were denied routine medical care, and there was inadequate heat in the cell block. These allegations are addressed individually below.

### 1. *Temperature and Quantity of Food*

Plaintiffs allege that they were not given hot food during the period of the lockdown and that they were left hungry because the quantity of food provided was not sufficient. With the exception of plaintiffs Talib Din and Rashad,[10] there is no allegation that plaintiffs failed to receive three meals a day or that the meals they received were not nutritionally adequate.[11]

Prisoners are guaranteed a nutritionally adequate diet. *See Wilson v. Seiter*, 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The provision of cold food is not, by itself, a violation of the Eighth Amendment as long as it is nutritionally adequate and is "prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Brown v. Detella*, 1995 U.S. Dist. Lexis 13260, *8 (N.D.Ill. Sept. 7, 1995), *citing Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). The court agrees with the Eighth Circuit in noting that "a diet, such as this one, without fruits and vegetables might violate the eighth amendment if it were the regular prison diet." *Rust v. Grammer*, 858 F.2d 411, 414 (8th Cir.1988). However, as in the *Rust* case, "because the sandwich diet was imposed only for a short time, with no resultant long-term adverse effects, it was a constitutionally permissible response to the disruptive situation." *Id.* (two sandwiches served three times a day for a period of less than two weeks). *See also McLeod v. Scully*, 1984 WL 692, *2, 1984 U.S. Dist. Lexis 24731, *5 (S.D.N.Y. July 30, 1984) (provision of two meals per day during eight to ten day lockdown did not rise to the level of an Eighth Amendment violation); *Fisher v. Barbieri*, 3:95CV913 (D.Conn. May 19, 1999) (no violation where prisoners were denied hot meals during the course of twenty eight day lockdown); *Brown–El v. Delo*, 969 F.2d 644, 648 (8th Cir.1992) ("claim that [plaintiff's] constitutional rights were violated when he was served cold food is frivolous"); *Hayward v. Procunier*, 629 F.2d 599, 600 (9th Cir. 1980) (no constitutional violation where prisoners were served sack lunches twice a day in their cells for two weeks during five month lockdown); *Hoitt v. Vitek*, 497 F.2d 598, 601 (1st Cir.1974) (prisoners' allegations concerning denial of hot meals failed to state cognizable claim of cruel and un-

**10.** Plaintiff Din's and Rashad's allegation that they failed to receive their Ramadan meals is addressed below, as is Plaintiff Skeeter's claim that he did not receive his medically prescribed diet during the lockdown period.

**11.** From the record before the court, it appears that inmates observing Ramadan would not have received three meals each day during the religious holiday. Rather, these inmates would receive a meal after sunset to break the fast, and another meal before sunrise to start the fast.

usual punishment, given that prisoners were otherwise adequately fed); *Gawloski v. Dallman*, 803 F.Supp. 103, 111–12 (S.D.Ohio W.D.1992) (holding that inmate's allegation that prison officials failed to provide hot meals "did not constitute cruel and unusual punishment absent some indication that [the inmate] received less than one meal per day or that the meals lacked nutritional value or were in some way physically harmful to [the ˙inmate's] health"). Based on the facts presented to the court and the above authorities, the Court finds that plaintiffs did not suffer a sufficiently serious deprivation of their rights because there are no allegations that they did not receive nutritionally adequate meals during the lockdown. Thus, plaintiffs' Eighth Amendment claim based on the failure to provide quantitatively sufficient meals, as well as hot meals, fails.

### 2. *Failure to Provide Special Diets*

█ Three of the named plaintiffs also claim that defendants failed to provide medically prescribed or religious diets during the course of the lockdown. Plaintiff Talib Din alleged that on March 19, 1993, his Ramadan meal was confiscated during the search of his cell, forcing him to go thirty two hours without food. Plaintiff Talib Din also alleged that during the rest of the lockdown period his Ramadan meals were not timely delivered. Plaintiff Rashad stated that on two occasions his presunrise Ramadan meal was not delivered.

Plaintiff Skeeter stated that he received a medical pass for a "low fat bland diet" on March 18, 1993, in order to treat several of his medical problems. Plaintiff Skeeter did not receive food permitted by his prescribed diet until March 24, 1993. Plaintiff Skeeter stated that he informed the

guards every day that he had a medical condition and he was not receiving meals in accordance with the prescribed diet.

Although in a different context the failure to provide a special diet could constitute an Eighth Amendment violation, the court does not believe it to be so here. In this situation, none of the plaintiffs has alleged sufficient facts which would allow the court to find that prison officials acted with deliberate indifference. Assuming that plaintiffs have alleged a sufficiently serious deprivation, there is no indication that the prison officials acted with deliberate indifference in that they "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Branham v. Meachum*, 77 F.3d 626, 631 (2d Cir.1996) (*quoting Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway*, 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995)). In plaintiff Talib Din's case, one meal was confiscated during the initial cell search but there is no indication that he failed to receive future meals, even if delivered in an untimely manner. Plaintiff Rashad missed two meals, but again there is no indication that he did not receive all other meals during the lockdown.[12] *See Warren v. Irvin*, 985 F.Supp. 350, 356–57 (W.D.N.Y.1997), *citing Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir.1983) (finding deprivation of one meal did not constitute Eighth Amendment violation); *McLeod v. Scully*, 1984 WL 692, 1984 U.S. Dist. Lexis 24731 (S.D.N.Y. July 30, 1984) (no violation where inmates provided two meals a day during lockdown); *Moss v. Ward*, 450 F.Supp. 591, 596 (W.D.N.Y.1978); *Gawloski v. Dallman*, 803 F.Supp. 103, 111–12 (S.D.Ohio, W.D. 1992). For these two plaintiffs, there are absolutely no facts before the court that

---

**12.** In fact, Rashad appears to be the only plaintiff that states that he received hot meals during the course of the lockdown.

would show defendants acted with the requisite subjective intent sufficient to state a viable Eighth Amendment violation.

■ Plaintiff Skeeter's claim requires a closer analysis of the deliberate indifference question since he alleges he informed the guards that he was not receiving his medically prescribed diet. However, plaintiff Skeeter first received a pass for his special diet on the day the lockdown began. There is no evidence that prior to this time Skeeter was on any special diet or that the guards would have had prior knowledge of this fact. Plaintiff Skeeter also failed to allege that he was harmed in any way by not receiving his special diet.[13] As it is undisputed that Skeeter received three nutritionally adequate meals a day during the lockdown, his claims are insufficient to show that the prison officials acted with deliberate indifference.

As in *McLeod v. Scully,* this court believes that "consideration of the staffing problems which resulted from the emergency situation and the limited time during which special diets were unavailable precludes" finding a constitutional violation. 1984 WL 692, *2, 1984 U.S. Dist. Lexis 24731, *7, No. 81 Civ. 3189 (S.D.N.Y. July 30, 1984). It is well established that prison officials must be given leeway to make administrative decisions when matters of security are at issue. *See Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (courts should be hesitant to interfere with internal prison administration, which is a matter within the realm of expertise of prison officials); *Gilliard v. Oswald,* 552 F.2d 456, 459 (2d Cir.1977); *McLeod,* 1984 WL 692, *2, 1984 U.S. Dist. Lexis 24731, *7; *Hayward v. Procunier,*

629 F.2d 599, 602–03 (9th Cir.1980). Under the circumstances of this lockdown, the court does not believe that an Eighth Amendment violation occurred when prison officials failed to provide plaintiff Skeeter with his prescribed diet or when plaintiffs observing Ramadan did not receive meals. Rather, the Court finds that the evidence indicates that prison officials made special attempts to accommodate inmates observing the religious holiday and to provide special diet trays to other inmates during the lockdown.

### 3. *Lack of Showers or Change of Clothing During the Lockdown Period*

Plaintiffs allege that they were not permitted to shower or have a change of clothing during the seven day lockdown, which caused some plaintiffs to have rashes on their bodies. Defendants do not contest the claim that plaintiffs did not receive showers during the lockdown.

■ Even though plaintiffs were not permitted to shower during the lockdown, this claim fails to rise to the level of an Eighth Amendment violation. The failure to provide inmates with showers during lockdowns has been upheld in cases where the lockdown itself was not subject to constitutional challenge. *See Fisher v. Barbieri,* 3:95CV913 (D.Conn. May 19, 1999) (no violation where showers were prohibited during twenty eight day lockdown); *McLeod,* 1984 WL 692, *2, 1984 U.S. Dist. Lexis 24731, *6 (no violation where prison deprived inmates of showers during eight day lockdown); *Keer v. Hogland,* 1996 WL 204574, *1, 1996 U.S.App. Lexis 10993, *3 (9th Cir. April 26, 1996) (denial of shower on two occasions during course of nine day lockdown failed to state constitutional violation); *Rust v. Grammer,* 858 F.2d 411,

---

**13.** Plaintiff Skeeter's only allegation is that his health could have been jeopardized due to his "weakened medical condition." [Doc. # 92 at 19.]

414–15 (8th Cir.1988) (holding cancellation of shower privileges during nine day lockdown did not violate Eighth Amendment); *Wright v. DeBruyn*, 1996 WL 441879, *1–3, 1996 U.S. Dist. Lexis 11143, *4–7 (N.D.Ind. Jun. 4, 1996) (holding no violation where showers were prohibited during first three to four weeks of ten month lockdown; after first month inmates were permitted to shower once every eight to ten days).

■■■■■ Although in some circumstances the failure to provide inmates with clean clothing could constitute cruel and unusual punishment under the Eighth Amendment, it is not a *per se* constitutional violation in all cases. Here, in the context of an emergency situation in which the warden imposed a lockdown to restore security to the facility, the Court finds that defendants' failure to provide plaintiffs with a change of clothing fails to rise to the level of an Eighth Amendment violation. *See McCorkle v. Walker*, 871 F.Supp. 555, 557 (N.D.N.Y.1995) (no Eighth Amendment violation where plaintiff was not given a change of underwear for 15 days); *Chavis v. Fairman*, 51 F.3d 275 (7th Cir.1995), *unpublished disposition*, 1995 WL 156599, *5 (Apr. 6, 1995) (court found no violation where inmate was forced to wear same uniform for three weeks); *Roberts v. Department of Correction*, 1996 WL 526779, *4 (N.D.Ill. Sept.12, 1996) (Inmates forced to wear same set of clothing for 13 days; "such a short period of time without a change of clothing is nothing more than a temporary inconvenience and hardly rises to the level of the unnecessary and wanton infliction of pain."). Furthermore, there are no facts from which the court could conclude that defendants acted with deliberate indifference. Rather, the record indicates that defendants acted uniformly toward all plaintiffs during the lockdown, in order to efficiently and thoroughly search the cell blocks to remove contraband materials and, ultimately, to restore security to the facility.

Thus, the prohibition of showers and failure to provide a change of clothing during the seven day lockdown period does not demonstrate that plaintiffs were deprived of a minimum civilized level of life's necessities or that defendants acted with deliberate indifference to the health and safety of the plaintiffs.

### 4. *Denial of Routine Medical Care*

Plaintiffs also allege that the defendants denied them medical care during the lockdown in violation of the Eighth Amendment. Here, plaintiffs Branham and Roberts stated that they requested medical treatment for rashes and were not seen by anyone on the medical staff. Plaintiff Rashad stated that, although he was not seen by medical personnel for treatment of blood in his stools, he did speak with a medic about the problem. Plaintiffs Roberts and Rashad also stated that they requested, and were denied, treatment for headaches and nausea due to lack of food. The remaining plaintiffs who experienced medical ailments do not claim that they asked for and were denied medical treatment.

■■■■■ In order to establish a claim for inadequate medical care under the Eighth Amendment, a prisoner must prove "deliberate indifference to his serious medical needs." *Cole v. Artuz*, 2000 WL 760749, *3, 2000 U.S. Dist. Lexis 8117, *10 (S.D.N.Y. June 12, 2000) (*quoting Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). Here, plaintiffs have failed to prove that the rashes on Branham or Roberts, or Rashad's ailment, constituted a "serious medical need." *Id.* Furthermore, plaintiff Rashad makes no claim that he was denied the opportunity to see medical

staff after speaking with the medic. The claims of hunger pains and nausea appear to be more directly related to the allegations that plaintiffs received an insufficient quantity of food, rather than something that could have been treated by the prison medical staff. Because plaintiffs have failed to show that any of them suffered from serious medical conditions and that defendants "intentionally denied or delayed [plaintiffs'] access to medical care," their Eighth Amendment claim based on inadequate medical care must fail. *Cole,* 2000 WL 760749, *4, 2000 U.S. Dist. Lexis 8117, *11.

### 5. *Inadequate Heating*

■ Plaintiffs claim that they were cold during the lockdown because they had no heat, the cellblock windows were broken, they only had the clothes they were wearing, and only one sheet or blanket. It is well established that warmth is an "identifiable human need," a deprivation of which may constitute an Eighth Amendment violation. *Maguire v. Coughlin,* 901 F.Supp. 101, 105 (N.D.N.Y.1995). *See also Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir. 1988); *Dixon v. Godinez,* 114 F.3d 640, 642 (7th Cir.1997) ("prisoners have a right to protection from extreme cold"); *Chandler v. Baird,* 926 F.2d 1057, 1064–65 (11th Cir.1991). Although prisoners have a constitutional right to adequate heating in times of cold weather, they must still show

that the conditions they were subjected to were "incompatible with the evolving standards of decency that mark the progress of a maturing society, . . . or . . . involve[d] the unnecessary or wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal quotations and citations omitted). *See also Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (Eighth Amendment violation occurs on the basis of inadequate conditions where there is an extreme deprivation; mere discomfort is not enough).

■ Here, plaintiffs have failed to show that the conditions in the cell block causing the prisoners to be cold constituted an extreme deprivation.[14] Plaintiffs have alleged only that they were cold during the period of the lockdown. There are no allegations that plaintiffs suffered any physical manifestations of their discomfort from the cold. There are also no claims that any of the prisoners complained about the cold to the prison guards. Plaintiff Damon Perry stated in his deposition that he thought the temperature in his cell during the lockdown was approximately 65 degrees. [Doc. # 158 at Attachment 1, 116.][15]

Defendants have submitted an affidavit from Clifford Jenkins, DOC Plant Engineer responsible for the plant maintenance at Somers. [Doc. # 171.] Jenkins states that he reviewed the power plant and boiler room logbooks for the relevant time period, and found that both were fully

---

14. The court recognizes that an allegation that prisoners are cold is generally a question of fact to be decided by the fact finder. *See Corselli,* 842 F.2d at 27. However, there have been no reported cases that found a temperature of 65 degrees to be an extreme deprivation, where there were no physical manifestations of the inmates' discomfort and no allegations that complaints were made to the prison officials.

15. Notably, none of the affidavits submitted with plaintiffs' Local Rule 9(c) statement complain explicitly about the cold temperatures or any discomfort. The only references to the temperature were found in one plaintiff's statement that the guards refused to turn the heat on [Exhibit 9] and that one plaintiff felt like a homeless person because he had to sleep on a bare mattress with just a blanket on a cold night [Exhibit 3].

operational during the period March 18–25, 1993. [*See id.*] Jenkins also indicated that to his knowledge the temperature in F Block was always between 65–70 degrees, while E Block cells were always above 60 degrees. [*See id.*] Finally, Jenkins stated that the heat was on during the entire period and that individual officers at Somers had no ability to adjust the temperature in the facility. [*See id.*] Under the circumstances in this case, the court does not believe that plaintiffs' allegations describe conditions that are either "shocking to the conscience" or "barbarous." *Scot v. Merola,* 555 F.Supp. 230, 233 (S.D.N.Y.1983) (*quoting Sostre v. McGinnis,* 442 F.2d 178, 191–92 (2d Cir. 1971)), *overruled on other grounds, Davidson v. Scully,* 114 F.3d 12 (2d Cir.1997). *See also Morrison v. Lefevre,* 592 F.Supp. 1052, 1078 (S.D.N.Y.1984) (holding that refusal to close window near cell when temperature low reached 27 degrees was not a constitutional violation; "[e]xposing a prisoner to unpleasantly cold but not dangerous temperatures is not sufficiently 'repugnant to the conscience of mankind' to violate the Constitution"); *Scot,* 555 F.Supp. at 233 (holding no violation where plaintiff confined in "sub-standard conditions in that his housing area had no heat, broken windows, and the temperature dropped below 50 degrees"); *Palmer v. Johnson,* 193 F.3d 346 (5th Cir.1999) (degree to which temperature fell was relevant to a determination on whether a constitutional violation occurred); *Dixon v. Godinez,* 114 F.3d 640 (7th Cir.1997) (allegations of average temperature in cell around 40 degrees, with ice on walls of cell could be an Eighth Amendment violation depending on the totality of the circumstances); *Grubbs v. Bradley,* 552 F.Supp. 1052, 1122–23 (M.D.Tenn.1982) ("constitutionally adequate housing is not denied simply by uncomfortable temperatures inside cells, unless it is shown that the situation engenders inmate health").

Furthermore, plaintiffs also fail to allege any facts that would show that defendants were "deliberately indifferent" to their health and welfare from the temperature inside the cells. In the context of this emergency lockdown, there are no facts on the record before the court to support a conclusion that defendants' actions were based on anything other than a desire to maintain facility security. Plaintiffs also do not dispute that defendants had no ability to adjust the heat and that defendants promptly covered any broken windows on the E-block. Therefore, the Court finds that the fact that plaintiffs may have been subjected to unpleasant but not dangerous temperatures does not rise to the level of an Eighth Amendment violation.

In conclusion, plaintiffs' allegations that they were subjected to inadequate conditions of confinement during the lockdown period do not demonstrate that the defendants acted with deliberate indifference to their health and safety or deprived them of the minimum level civilized level of life's necessities. The Court concludes that the plaintiffs fail to state a claim for a violation of their rights under the Eighth Amendment.

### B. *Qualified Immunity Defense*

Although the Court has found that plaintiffs failed to state an Eighth Amendment claim, the court will, in the alternative, address defendants' qualified immunity defense. As discussed below, the Court finds that the defendants have a viable qualified immunity defense to plaintiffs' Eighth Amendment claims.

Government officials are shielded from liability for damages on account of their performance of discretionary official functions "insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "The availability of the defense generally turns on the objective legal reasonableness of the allegedly unlawful official action, assessed in light of the legal rules that were clearly established at the time it was taken." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 531 (2d Cir.1993)(internal quotations omitted). To determine whether a particular right was clearly established at the time defendants acted, a court should consider:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

The first step in the qualified immunity analysis is to determine whether the law in question was clearly established at the time the action occurred. As discussed above, prisoners have a clearly defined right to receive "adequate food, clothing, shelter and medical care" under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

The next step in the analysis "generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time the action was taken." *Murchison v. Keane,* 2000 WL 489698, *11 (S.D.N.Y. Apr.25, 2000) (quoting *Anderson v. Creighton,* 483 U.S. 635, 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). *See also Mollica v. Volker,* 229 F.3d 366, 371 (2d Cir.2000) ("The determinative question therefore becomes whether under preexisting law [defendants] ... would have understood ... [their] ... acts [to be] unlawful.") (internal citations omitted).

Here, lockdown status was imposed on March 18, 1993, after two guards were attacked and the warden believed that more attacks were imminent. These attacks occurred after several stabbings took place in early March 1993.[16] The lockdown was imposed to protect both the prison staff and the inmates by allowing prison officials to ensure the safety of all by searching for contraband weapons and materials. In order to maintain the security of the facility, prisoners were confined to their cells until the cell blocks could be thoroughly searched and the prison officials could be confident that order would be established once the lockdown status was lifted. During the search of the cells, prison officials confiscated 88 weapons. Given this background, plaintiffs make no challenge to the constitutionality of the lockdown itself.

Based upon the law discussed above, the court finds that no reasonable prison official would have believed his actions violated the law at the time of the lockdown.

---

**16.** Warden Kupec's monthly report from March 1993 details stabbings on March 4, 5, and 7. [Kupec Discovery Responses, Tab # 14.] On March 15, 1993, an inmate assaulted a nurse who was making sick rounds; a group disturbance occurred on March 15, 1993, requiring warning shots from the guard; and, in separate events on March 17, 1993, an inmate threw human waste on a prison guard and another inmate was stabbed several times while in the shower. [*See id.*]

All of plaintiffs' complaints concerning defendants' failure to provide adequate conditions of confinement were addressed under preexisting law and found to conform with the mandate of the Eighth Amendment. In such a situation, there was no clear case law that clearly indicates that defendants' actions were unreasonable or violated the Constitution. Furthermore, for many of plaintiffs' allegations, no complaints were made to the prison guards, which would have provided defendants with some notice of the problems. Thus, the Court finds that, even if an Eighth Amendment violation occurred during the March 1993 lockdown, defendants are entitled to qualified immunity on these claims.

*CONCLUSION*

Plaintiffs have failed to show that an Eighth Amendment violation occurred during the March 1993 lockdown. In the alternative, defendants are also entitled to qualified immunity. For the foregoing reasons, **defendants' Motion for Summary Judgment is GRANTED. [Doc. # 169.]**

Any objections to this recommended ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir.1989)(per curiam); *F.D.I.C. v. Hillcrest Assoc.*, 66 F.3d 566, 569 (2d Cir.1995).